# MARION CONSTRUCTION COMPANY v. A. E. STEEPLETON.

Middle Section. December 12, 1931.

Petition for Certiorari denied by Supreme Court, February 13, 1932.

J. E. Travis, of Nashville, and P. J. Anderson, of Gainesboro, for plaintiff in error.

L. A. Ligon, of Carthage, and Harry L. Page, of Gainesboro, for defendant in error.

FAW, P. J.  On a former day of the present term, viz.: November 7, 1931, an order was entered striking this case from the docket of this court, for the reason that it did not appear from the transcript of the record that defendant had perfected its appeal by filing an appeal bond as required by law and by the order of the trial court granting the appeal.

Within ten days after the case had been thus stricken from our docket, defendant Marion Construction Company filed a petition for a rehearing and for leave to suggest a diminution of the record, accompanied by a certified transcript of an appeal bond which, it now appears, was seasonably filed below, but was omitted by oversight from the transcript as originally certified to this court.  The plaintiff Steepleton does not resist the petition or the diminution of the record.

The defendant's petition for a rehearing is granted, and the aforesaid order of November 7, 1931, striking the case from our docket, is vacated and set aside.  The supplemental transcript exhibited with the petition to rehear will be filed as a part of the transcript of the record in this court, and the judgment of the circuit court will be reviewed on the record, the defendant's assignments of error and brief, the plaintiff's reply brief, and oral argument of counsel at the bar.

In the memorandum opinion filed at the time the case was stricken from the docket on November 7, 1931, we called attention to the fact that the transcript contains a purported bill of exceptions signed by the trial judge. but which is not marked filed by the clerk of the trial court.  The defendant's petition to rehear makes no mention of this defect in the record, and, apparently, it was either overlooked or ignored by the attorneys for the defendant.  A re-examina-

tion of the transcript has confirmed our former statement that the bill of exceptions was not marked filed by the clerk of the trial court, as it should have been, but such re-examination has discovered an unusual condition of the record which, in our opinion, shows that the bill of exceptions became a part of the record, notwithstanding the failure of the clerk of the trial court to place an endorsement thereon stating, over his signature, that it was filed and the date when filed.

The minutes of the trial court show that the appeal was granted on August 1, 1931, and the defendant was allowed thirty days from that date in which to execute an appeal bond and file its bill of exceptions. Defendant filed an appeal bond on August 12, 1931. The transcript contains a bill of exceptions which purports to have been signed by the trial judge on August 11, 1931. Immediately following the bill of exceptions is the certificate of the clerk of the transcript, which certificate is in words and figures as follows:

"I, W. R. Hawkins, circuit court clerk of Jackson county, Tennessee, do hereby certify that the foregoing and the within is a true and perfect copy of the bill of exceptions and the proceedings in the above and the within styled cause as appears of record in my office, this August 31, 1931.

"W. R. Hawkins, Clerk."

The imprint of the seal of the circuit court of Jackson county, Tennessee, is annexed to the clerk's signature.

It is seen that the foregoing certificate of the clerk was made within the period of thirty days granted to defendant for filing a bill of exceptions, and that, at that time (according to the clerk's certificate) a bill of exceptions in this cause was "of record" in the office of the circuit court clerk of Jackson county, Tennessee, and that the bill of exceptions in the transcript is a true and perfect copy of said bill of exceptions.

It is well settled that the contents of a bill of exceptions cannot be considered for any purpose on appeal unless it affirmatively appears that it was filed with the clerk of the trial court within the time allowed by law. A number of opinions of the Supreme Court in which it was so held are cited in Cosmopolitan Life Insurance Co. v. Woodward, 7 Tenn. App., 394, 402.

"A paper is said to be filed when it is turned over to the proper officer, and by him received to be kept on file.". Fanning v. Fly, 2 Cold., 486, 488; Mason v. Spurlock, 4 Baxt., 554, 560.

The endorsement of the clerk is evidence of the filing, but is not essential to the validity thereof. 31 Cyc., p. 591; Fanning v. Fly, supra; Cofer v. Cofer, 1 Tenn. App., 538, 546.

It is a necessary inference from the recitals of the aforesaid certificate of the circuit court clerk that the bill of exceptions copied into the transcript in the instant case was turned over to, and re-

ceived by, him, to be kept on file as a record of his office; and the date of his certificate (August 31, 1931) shows that this was done within the time granted by the trial court for filing a bill of exceptions. It thus affirmatively appears that it was filed with the clerk of the trial court within the time allowed by law, and became a part of the record for the purposes of the appeal.

A. E. Steepleton, hereinafter called plaintiff, sued Marion Construction Company, a corporation, hereinafter called defendant, in the circuit court of Jackson county, for $20,000, as damages for injuries to the person of plaintiff and to his automobile. The case went to trial before a jury, on the issues made by defendant's plea of not guilty to plaintiff's declaration, and, after overruling a motion on behalf of defendant for peremptory instructions, the court submitted the case to the jury, and the jury found the issues in favor of the plaintiff and fixed his damages at the sum of $1,250, viz.: $462 for damage to plaintiff's automobile and $788 for injuries to plaintiff's person. Defendant's motion for a new trial was overruled and judgment entered on the verdict, whereupon defendant appealed in error to this court and assigned errors here.

On January 15, 1931, and for some time theretofore, defendant, Marion Construction Company, was engaged, pursuant to a contract with the State Highway Department, in the work of reconstructing certain sections of State Highway No. 53 between the towns of Gainesboro and Celina, and in the course of this work it became necessary for defendant to "blast off," with dynamite, portions of a rock bluff near the mouth of Roaring River about a mile and a half northeast of Gainesboro on said Highway No. 53 in order to widen said Highway. Accordingly holes were drilled down through the rock, behind the face of the bluff, to the level of the highway grade, in which holes heavy charges of dynamite were placed, and at, approximately, eleven minutes after two o'clock in the afternoon of January 15, 1931, the "shot" was "fired" by means of an electric battery, under the direction of one Irving, an employee of defendant, and great quantities of rock, earth, etc., were precipitated onto the roadway alongside the bluff at that point.

At the instant the "blast" was "fired," the plaintiff, A. E. Steepleton, driving an automobile—a Chevrolet coupe—was on that part of the highway immediately adjacent to the bluff where the explosion occurred, and plaintiff and his automobile were "blown" off the highway and down an embankment. Plaintiff's automobile was crushed and practically destroyed. Plaintiff was thrown out of the automobile and suffered serious and painful personal injuries.

Plaintiff is a young man about twenty-six years of age—a traveling salesman, covering periodically, in his automobile, a territory which includes Gainesboro and Celina.

The respective theories and contentions of the parties on the trial below were well stated by the learned trial judge in his charge to the jury, as follows:

"It is the theory and contention of the plaintiff in this case that he was here in Gainesboro, Tennessee, on the 15th of January, last, 1931, and that he, in his usual, ordinary business way, was traveling from, or expecting to travel from, here to Celina. That he was engaged in selling for some wholesale house, Iten Biscuit Company, its products. That he waited on a number of the merchants here in Gainesboro, and that he was told that the road between Gainesboro and Celina would be closed and a blast put off at about 2:30 o'clock in the afternoon of that day. That he looked at his watch and saw that it was about five minutes past 2 o'clock, that where the road was to be closed was near Gainesboro and that he saw that he had plenty of time to get beyond the place where the blast was to occur before the time for the road to be blocked and the blast to go off, and that he thereupon started on his way from here to Celina, that in traveling along the highway between here and where the blast was that he did see a danger sign, but that that was a common, usual, ordinary sign on the highway, frequently put up on short turns of the highway or where any portion of the road was under construction, and not such a sign as would give him any particular warning or that there was any particular danger that he might be expected to run into. That if there was a Road Closed sign up, that he did not see it and that he went on in the direction of Celina in his usual mode of travel, and as he insists an ordinarily prudent man would have done under like conditions. That along near to where this blast later occurred, that he met people on the highway. That he saw nothing to call his attention to the fact that there was any blast soon to occur. That just before the blast occurred, that he met two men in an automobile, whom he thought were farmers or someone coming from up in the same direction; that as he passed them, one of them said something, and that from the movement of his lips and what he caught, he thought he said, 'Buddy, you can't get through,' or words to that effect, which he claims he interpreted as meaning there was probably some rocks or something in the way that might prevent him from going along, but that there was no indication given to him that there was any particular danger to look for. That he had no idea that the blast would go off before the time fixed, at 2:30, as he understood, and it then was not exceeding 2:07 or 2:08, within two or three minutes after he had looked at his watch, at 2:05. That there was no barricade to prevent him from going in, that the men who were there as servants of Marion Con-

struction Company gave him no kind of timely warning as might be expected from any ordinarily prudent man under such conditions, and he further insists, as a part of his theory, that if he were negligent in going along said highway, that at the time he was seen by the servants of the defendants, Marion Construction Company, that he was then in peril, that the servants of the Construction Company knew that this blast would go off in a very short time, in a few moments, that he was headed toward the blast, that a reasonably prudent man would have known that heading as he was, and being in the peril in which they were bound to have known that he then was, that it was their duty to have used more force or more power or more means to stop him and turn him away than were used and that a reasonably prudent man under such conditions would have so done, and that their failure to do so as he insists, would make them liable to him under the facts of this particular case. He insisting that when he met the automobile, that his window was up, that he could not catch what was said, that the automobile did not stop, but passed on, that he opened the door of his car and looked back and nobody said or did anything. That he went on and that he was acting as an ordinarily prudent man under such conditions would act, and that he was guilty of no negligence at that time, and that if he had been guilty of negligence before that, that there had been this supervening condition in that the defendant had come down here and had now found him submitted (subjected) to this perilous position and that they had failed to give him that character and kind of warning that under the conditions, should have been given, or that a reasonably prudent man would have given, and that, on that account, they are liable.

"That, I say, gentlemen of the jury, is the insistence of the plaintiff.

"It is the theory and contention of the defendant that this piece of highway was being constructed by contract entered into by and between the defendant, Marion Construction Company, Inc., and the Department of Highways and Public Works of the State of Tennessee, and that said road had been closed by the Department of Highways and Public Works under authority given it by chapter 74 of the Acts of Tennessee of 1917, commonly known as the Highway Act, and chapter 149 of the Acts of 1919, creating the Highway Commission and defining their rights and powers, and that said signs had been posted, notifying and warning the public that said road had been closed to travel and in addition thereto, danger signs had been posted along the highway, calling attention to the traveling public of the danger, that in addition to the above, plaintiff had actual

knowledge that a blast was going to be put off somewhere from 2 or 2:30 o'clock on the afternoon of January 15th, and that said blast was going to be of sufficient strength and force to blow off the end of the bluff. That the plaintiff was stopped and notified by employees of Marion Construction Company, that they said the road was closed and could not be used, as they were fixing to put off a blast. That the plaintiff disregarded the Road Closed sign, the Danger sign, the actual knowledge that the blast was to be made and the warning given plaintiff by employees, and continued his course, which resulted in his accident and injury, and the defendant insists that on that account, it is not liable.''

We have observed but one inaccuracy in the foregoing statement of the theories of the parties, and that is with respect to the time consumed by plaintiff in traveling from Gainesboro to the scene of the explosion. Plaintiff testified that he left Gainesboro at five minutes after 2 o'clock, and that the drive to the place where the explosion occurred occupied five or six minutes, so that he fixed the time of the "blast" at 2:10 or 2:11 P. M. There was no other evidence on this point. However, this slight inaccuracy in the court's statement was doubtless a mere inadvertence. It was not challenged by either party, and is now of no consequence.

The defendant's first, second and third assignments of error are as follows:

(1) There is no evidence to support the verdict of the jury; (2) The verdict is contrary to the law and the evidence, and (3) the court erred in overruling the defendant's motion for directed verdict at the close of the plaintiff's proof and also as renewed at the close of all the proof.

The second assignment, supra, is not equivalent to an assignment that there is no evidence to support the verdict, and it is too general and indefinite to merit consideration. Record v. Cooperage Co., 108 Tenn., 657, 69 S. W., 334.

The first and third assignments may be considered together, for if there was evidence sufficient to take the case to the jury, there was some evidence to support the verdict.

The motion for a directed verdict made by defendant at the close of the plaintiff's proof need not be considered, for when defendant proceeded to put on evidence in its own behalf, it waived the motion for peremptory instruction theretofore made, but it is entitled to rely upon the motion made at the close of all the evidence.

The question for decision, under the first and third assignments of error, is, whether there is any material evidence reasonably tending to support a verdict for the plaintiff. In this inquiry, that view of the evidence most favorable to plaintiff's contentions must be ac-

cepted here. See I. C. Railroad Co. v. Beaver, 3 Tenn. App., 67, 73, and other cases there cited.

We think some quotations from the testimony of the plaintiff will show that there was evidence to take the case to the jury, and which, if accepted by the jury as the truth of the case, was sufficient to support a verdict for plaintiff.

Plaintiff was asked and answered as follows:

"39. How far was it from Gainesboro to the point of the injury where the blast went off? A. The best of my judgment, about a mile and a half.

"40. Did you travel the main public road in going to that point? A. Yes.

"41. Was that road open and free for the public up to that time? A. Yes.

"42. Did you, on nearing the point where you were injured, meet others who had just come through the point and place where you were injured on the road? A. Yes, I met a truck and met a wagon just a short distance.

"43. Did you know the men you met? A. No.

"44. Was the truck loaded? A. I believe it was.

"45. And you didn't know the parties either on the truck or on the wagon, but you know they had just come through the point there? A. Yes.

"46. Just describe the circumstances under which you were injured, Mr. Steepleton, I will ask you this. Before you got to the point where your injury occurred, was there any signs or warning given you of any kind that they were in the act or expecting at any minute or at any time to discharge a blast of dynamite or anything of that kind? A. No.

"47. Was there any sign across the road, any danger sign of any sort, between here and there? A. Not to my knowledge.

"48. You didn't see any? A. No.

"49. Did you meet anyone who gave you any warning of danger that you were going into? A. As I approached the place where the blast occurred, I met an automobile, some open style car, with two men in the front seat.

"50. Did you know who they were? A. No.

"51. Do you know whether or not they were connected with the construction company? A. No sir.

"52. Did you know their names, either of them? A. No sir.

"53. If anything occurred between you and them or if they said anything to you, state what it was, if they gave you a warning of danger? A. As I was passing this car?

"54. Meeting it, you mean? A. Meeting it, I mean, they were going toward Gainesboro, I met them perhaps forty or fifty yards this side of where the blast occurred, and they were travel-

ing along, I should judge, at the rate of twenty-five miles an hour, and the fellow who was driving threw up his hand like this and said 'Buddy, don't believe you can get by there' (indicating with movement of hand), and on hearing this, I came to almost a complete stop and the window of my car was open and I looked back to see if they had anything to say, any further information to give me, and they did not.

"55. Did they stop when they said that? A. No.

"56. Did the other car slow down? A. I couldn't see that it even slowed down. It might have a little bit, but they were still continuing on at a pretty good speed.

"57. You are positive they did not stop? A. I absolutely know they didn't stop. I took particular notice to see if they had any particular warning to give me or anything to say, and they didn't so I continued on.

"58. What did you understand to be the meaning of their calling you 'Buddy', and telling you that they didn't believe you could get through?

"Mr. Travis: 'We except to this interpretation of what they said.'

"59. Was there any obstruction in the road or rocks or what appeared to have been blasted there from any place, that attracted your attention? A. Beyond me, I couldn't say how far, but below where the shovel was sitting on the side of the bluff, the shovel apparently had been in operation and had been taking out dirt, and rock from the side of the hill, had rolled some of this debris down the hill and there were a few scattered rock down there, apparently it was rock, from my point of view and my idea of the thing was that these gentlemen had been down there and perhaps turned around, couldn't get by, or that they had barely come through and thought someone else couldn't do it again. Anyway, just this little obstruction was ahead of me. It wasn't an obstruction. It was just a few scattered rocks. It looked like they had maybe come through or been down in there and turned around.

"60. As a matter of fact, you had met a truck and a wagon? A. Yes, I had met them and I couldn't see any reason why I couldn't come through. Apparently this car had got through.

"61. Did they have any pole or obstruction across the road at all that would have barred you from going on? A. You mean from the side I approached?

"62. Yes. A. No sir, they did not.

"63. Was the road wide open for travel as far as the road in front of you was concerned? A. That is right.

"64. Did you receive any other warning or notice of any blast from any other source except as you have just told? A. While

I was in Gainesboro,—I got to Gainesboro about 12:30, and I went into Meadows Cafe. I believe I called on Reed & Meadows first. They were there at the time any way, Meadows Cafe was one of the first places I stopped when I got to town. I had lunch in Meadows Cafe and I heard some talk. There were some people in there and I heard some talk of the road construction work and I believe Mr. Meadows asked me if I was going on to Celina, as I usually do, and I said 'Yes,' and either prior to that or at that time somebody had said that the road was going to be closed on this particular day and would probably be closed for a good number of weeks, perhaps thirty or sixty days.

"65. Did they state for what purpose it would. be closed, or for what reason? A. Perhaps for some construction work they were doing on this road and that it would be closed and that I had better go on if I wanted to get to Celina, that I had better get out of town.

"66. And what time did they inform you that the obstruction would take place? A. At 2:30, I understood.

"67. Did they tell you there would be a blast at that time? A. I didn't understand.

"68. Did you understand from them that there would be a blast about 2:30? A. Yes, and that this blast would perhaps impair the passage of the road and that it would be closed for some length of time, so having this information in mind, I hurried and worked the town. In fact, I passed up some of my customers, and the last place I called before leaving was Luke Dennis, and I was in his store and I just went in and said, 'Mr. Dennis. if you can buy anything from me——'

"Mr. P. J. Anderson: Attorney for plaintiff, 'We object to the conversation.'

"The Court: 'I sustain the exception. It is not material what you said.'

"69. You needn't tell what you said to him. Did you get any information from him of the hour this explosion would be had? A. I didn't get any information from Mr. Dennis, no sir. I just looked at my watch and it was five minutes after two and I said, 'Well. good-bye, Mr. Dennis. I will see you in two weeks' and I got in my car and left Gainesboro.

"70. Did you go immediately on toward Celina? A. Yes.

"71. How long did it take you to travel to the point of injury? A. About five or six minutes.

"72. Did you have any occasion or was there anything along the road to attract your attention as a warning of danger? A. No sir.

"73. Or cause you to be on your guard, or anything of that kind? A. No.

"74. Nothing occurred except what these two men said? A. That is absolutely all.

"75. They said, 'buddy, we don't believe you can get through'? A. That is absolutely all.

"76. Tell what happened to you and your car. A. After meeting these two men in the car and they made no explanation, nor gave any warning of danger, I continued on and I don't suppose I had gone over forty yards until the blast occurred and don't really know much about what happened from that time.

"77. Now, Mr. Steepleton, where was that blast with reference to where you were? You were on the road, now where was the blast? A. The blast was in the rock bluff right beside and above me, apparently these shots were drilled down to the level of the road and this mass of rock was blasted out into the highway and on top of me.

"78. As I understand you, the upper side of the road, or the road where the blast was located was higher ground than the road was? A. Yes.

"79. Was it a bluff or a cliff or ledge of rock? A. It was a ledge of rock perhaps thirty or forty feet high.

"80. The blast had been put in the ledge of rock? A. The blast had been put down into the ledge of rock, apparently they were widening the road and blasting out this ledge of rock.

"81. The effect of the blast on the rock was to force all that rock loose and blow the rock down into the public road where you were; that is correct, is it? A. That is correct.

"82. Do you have a definite recollection of hearing the blast go off, and seeing it? A. I don't remember seeing it, I heard it and the next thing I knew I hit something and I was rolling.

. . . . . .

"106. If so, in what way? Let me ask you this; do you know where they found you when you were found? A. At the bottom of this bluff—this embankment—immediately below where the blast occurred—perhaps sixty or seventy-five feet from the highway.

"107. Thrown entirely off the highway? A. Yes.

"108. Was your car thrown off the highway too? A. The car was thrown off the highway perhaps twenty or twenty-five feet, anyway I was blown beyond the car.

"109. You and your car were found at different places then, as I understand you? A. Yes.

"110. You were not with the car at the time it was found? A. No.

"111. You were at one place and the car at another? A. Yes.

"112. Have you any idea of the quantity of wreckage and stone that was thrown out of the bluff there by the dynamite? Was it a large or small quantity? A. It was a very large quantity, I couldn't exactly quote the dimensions, I couldn't say what was the length of the blast along this bluff, but I imagine it was at least 100 feet.

"113. One hundred feet distance there blown off? A. Yes, I couldn't absolutely make that statement positively because I do not know, but from the best of my knowledge and the way it appeared, it was a great mass of rock that came down.

"114. The discharge from the dynamite exploded, and blew off dirt and roots of trees and the usual stuff coming out of a bluff? A. Yes."

We also quote from the cross-examination of plaintiff as follows:

"16. When you left Gainesboro that afternoon you knew this road was under construction? A. Yes.

"17. You knew that somewhere in the afternoon from two to two-thirty, that the end of this bluff was going to be blasted off? A. I was under the impression they were going to have some kind of a blast.

"18. You weren't under the impression; you had been told, isn't that correct? A. Yes.

"19. When you went out of Gainesboro, you passed a steam shovel under operation between here and the scene of the accident, didn't you? A. Not that I know of.

"20. You don't remember that? A. No.

"21. Did you see any Road Closed sign between here and where the accident happened? A. No sir.

"22. Did you see any danger signs, with red and white stripes on them, posted between here and the scene of the accident? A. I believe there was one somewhere along the road, but to the best of my remembrance, it was at the point of intersection of the two roads where one crosses the bridge and the other goes under the bridge, there was a sign.

"23. About how far was that from the scene of the accident? A. That was about a mile this side of the place where the accident occurred.

"24. That Danger sign, you saw that there? A. Yes.

"25. You know what that meant? A. I see them everywhere.

"26. You drive around over Tennessee enough to know that means construction work ahead, don't you? A. No, it perhaps would mean a narrow bridge or a curve.

"27. That is not a curve, is it? A. Those danger signs are placed in such places.

"28. It is to indicate to the traveling public that there is danger ahead? A. Yes.

"29. Where was it you met the wagon and the truck; which did you meet first? A. I met the truck first.

"30. You met the truck? A. Yes.

"31. And how far was that this side of this accident? A. Well, the truck and the wagon, I met both of them somewhere this side of the Cumberland River Bridge, met one along there and one down the road, I really don't remember which I met first because I was paying no attention to people who I was passing. I never do.

"32. How far was that this side of your accident? A. Well, it is—how far was what?

"33. Where you met the wagon and the truck? A. I met one at one place and one at another.

"34. Well, where did you meet the truck; how far this side of the scene of your accident? A. Well, it must have been a quarter of a mile, something like that.

"35. Then how far this side of the accident did you meet the wagon? A. I don't remember which one I met first.

"36. Did you meet them both this side of Cumberland River Bridge? A. I think so, yes.

"37. Well, as a matter of fact, Cumberland River Bridge is about half a mile this side of the accident; is that right? A. No.

"38. How far do you say it is? A. I don't suppose it is over a quarter of a mile.

"39. Now then, the next thing you met were two men in a car? A. Yes.

"40. What kind of a car do you say that was? A. I don't know, it was some sort of an open car, a touring car.

"41. To refresh your recollection, wasn't it a closed car, and didn't the man who was driving that car roll down the window and sign you down with his hand out through the window? A. No sir.

"42. What did he do? A. He said, 'I don't believe you can get by there,' something to that effect, to the best of my knowledge, that is what he said, but he didn't stop, so I didn't have any opportunity to actually know what he said.

"43. He gave you the stop signal, did he not? A. No, only he threw up his hand in this manner. (Indicating.)

"44. Well, didn't that put you on guard or didn't you feel uneasy driving by a man signing you down and saying to you, 'I don't think you can get by there,' knowing that there was going to be a blast put off? A. I knew it was to be put off and was under the impression it was to be put off about half an hour in the future, and due to the fact that the man didn't give more

warning that he was not standing in the road with a red flag or that the road wasn't properly barricaded, he just merely threw his hand up as we passed, and not stopping and giving me any further information as to what was to occur, well, I stopped to see if he had any more to say.

"45. What became of that car? A. It went on.

"46. How far did you watch that car? A. I just watched it as it passed me and it continued on and so I went on my way.

"47. Didn't a man get out of that car and holler at you? A. No sir.

"48. Did you really hear what he said to you? A. Not exactly the statement he made was, the impression I got,—it sounded like he said, 'you can't get by, buddy.'

"49. Notwithstanding that warning you took chances and undertook to get by, was that your idea? A. My idea was, that the man didn't give sufficient warning to make me realize any impending danger, and, as I stated awhile ago, there was some sort of debris across the road and it looked to me like this man was a farmer or passer-by and that he had turned around or that he had barely come through this place and didn't think anybody else could get through again.

"50. Did you intend to get by, or intend to turn around? A. I didn't know which I could do, if I could get by I was going by and if I couldn't, I would have turned around, as I presumed the other man had done.

"51. You saw the steam shovel sitting there? A. Yes.

"52. You saw that it had stopped operations? A. Yes.

"53. Well, did that signify anything to you? A. Nothing except that there was no construction work going on, the steam shovel was not in operation, and nobody on the highway on either side.

"54 Now then, Mr. Steepleton, after the accident, I believe you say you were first brought down here to Gainesboro and first aid rendered, and then you were taken home? That is correct, isn't it? A. Yes.

"55. After your accident and after these gentlemen came up and you commenced talking to them, you remember that? A. Make your statement again.

"56. After the accident and after you came up out on the road there and talked to these gentlemen, you knew what was going on then? A. Partly, yes, I was more or less addled and subconscious as one would be under such a shock.

"57. You made a statement there, did you or did you not, say you knew they were going to put off the shot, but you didn't

know they were going to blow the whole damn bluff down?
A. No sir.

"58. You didn't make that statement? A. No.

"59. Do you remember making that statement to the man that led you back up to the road? A. No.

"60. Did you recognize him then as the man that signed you down in the car? A. No, I didn't see anybody. There were several around there and a general blur and haze, blood and dirt in my eyes, and I did not recognize anybody, there might have been my own mother there and I wouldn't have known her."

The testimony of Laughridge and Hensley, two of defendant's employees, shows that they were the occupants of the automobile which met plaintiff just before the "blast," and that they had been directed by defendant's foreman to go towards Gainesboro, on the highway, and warn persons on or in the vicinity of the highway, and within the danger zone, that the blast was about to be set off. Their account of the things said and done by them and by the plaintiff on that occasion differs in material respects from the account given by the plaintiff in his testimony, but there is no occasion to state their testimony here, for it is not within our province to weigh conflicting evidence, and the verdict for plaintiff implies that the jury accepted plaintiff's version of the facts.

The principles of law controlling the disposition of defendant's first and third assignments of error, supra, are, we think, well stated by the Court of Appeals of Kentucky in the case of Lexington & Eastern Railway Co. v. Fields, 152 Ky., 19, 153 S. W., 43, 4 Neg. Comp. Cas. Anno., 51, 57, wherein the court said:

"The law upon this subject is that, while persons engaged in legitimate work have the legal right to use explosives for the purpose of blasting, they are also under a duty to give reasonable warning before the explosion is made to all persons within the zone of danger from rocks or other substances that may be thrown by the blast, and if they fail to give this warning, and some person entitled to warning is injured thereby, the person causing the injury will be liable for the consequences of his act. It is likewise the duty of persons who receive the warning to use reasonable diligence and care to escape from or protect themselves from the danger, and a failure to exercise this degree of care and diligence will amount to such contributory negligence as will defeat a recovery."

Greater care must be exercised by those who use dynamite, or other high explosives, than is required in the use of less dangerous forces, and, as defendant knew (through Laughridge and Hensley) that plaintiff was entering the danger zone, it was defendant's duty to give plaintiff timely warning that the blast was about to be set off,

even though the State Highway Department had ordered that the highway be closed to public travel at that place and had posted "Road Closed" signs accordingly. L. & N. Railroad Co. v. Smith, 203 Ky., 513, 263 S. W., 29, 35 A. L. R., 1238, 1241-1242; Gates v. Latta, 117 N. C., 189, 53 Am. St. R., 584; St. Peter v. Denison, 58 N. Y., 416, 17 Am. R., 258, 262.

Negligence "is absence of the care that was nececssary under the circumstances." 20 R. C. L., p. 22, sec. 16.

"Legal phraseology prescribes degrees of care to be observed toward others, and fixes standards for determining whether in any particular case the prescribed degree has been exercised. To describe the degree of diligence that one must conform to, the terms usually employed are 'ordinary care' or 'reasonable care.' There is, however, no fixed standard in the law by which a court is enabled to say arbitrarily in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The surrounding facts and circumstances are of controlling importance. What may be deemed ordinary care in one case may, under different surroundings and circumstances, be negligence. Negligence is essentially relative and comparative. The legal duty we owe to others is the accepted standard, and that duty is measured by the exigencies of the occasion. The more imminent the danger, the higher the degree of care. As the hazard from the use, or threatened use, of dangerous instrumentalities increases, in all branches of the law, the responsibility of the person employing them becomes stricter and may amount to insurance of safety. When human life is at stake, the rule of due care and diligence requires everything that gives reasonable promise of its preservation to be done, regardless of difficulties or expense. In the last analysis it will be found that knowledge of the peril is the basic element of duty, from which it may be concluded that the care which must be exercised in any particular case is proportioned to the actor's knowledge, actual or imputed, of the danger flowing from the act performed. Said Mr. Justice Field: 'What would be extreme care under one condition of knowledge, and one state of circumstances, would be gross negligence with different knowledge and in changed circumstances.' Where a danger actually is foreseen, the duty is imposed to adopt every possible precaution to avoid an injury therefrom. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their province to note the special circumstances and surroundings of each par-

ticular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs." 20 R. C. L., pp. 24-26, sec. 18.

Under the evidence in this case, it was for the jury to say whether defendant's agents and servants did all that was demanded of them by the circumstances to convey to plaintiff a warning of the impending danger (Lexington & Eastern Railway Co. v. Fields, supra, p. 54; Mills v. Wilmington City Railway Co., 1 Marv. (Del.), 269, 40 Atl. 1114); for "what a person of reasonable prudence would have done under the same or similar circumstances must be determined by the jury from their knowledge of mankind, and of how persons of reasonable prudence usually deport themselves in relation to their surroundings." Railroad v. Wade, 127 Tenn., 154, 158, 153 S. W., 1120.

And it was likewise for the jury to determine whether or not plaintiff was guilty of negligence which proximately contributed to his injuries. 13 R. C. L., p. 524, sec. 434; Roofing & Mfg. Co. v. Black, 129 Tenn., 30, 36, 164 S. W., 1183; Smith v. Day (U. S. C. C. A.), 100 Fed., 244, 49 L. R. A., 108; Mills v. Wilmington City Railway Co., supra.

We find nothing in the case of Miller v. Twiname, 114 N. Y. Supp., 151, 129 App. Div., 623, cited for defendant, which conflicts with the views we have expressed herein. The defendant here had the legal right to use explosives and thereby throw stone and earth upon the highway (as in Miller v. Twiname), but this right was subject to the duty to exercise diligence, proportioned to the hazard, to warn persons in the vicinity, whether on or off the highway, that a blast was about to be set off.

The defendant's first and third assignments of error are overruled.

The defendant's fourth assignment is that the court erred in permitting the witness Maxey Stafford, over the defendant's objection, to testify as follows:

"Q. State whether or not people had been continuously traveling around there? A. Yes."

The above quoted question and answer referred to the highway at and in the vicinity of the place where plaintiff was injured.

We think this testimony disclosed a fact which the jury might properly consider as a circumstance shedding light on the conduct and the duties of the parties, respectively; but, however that may be, the admission of the brief statement of Maxey Stafford copied into the fourth assignment, supra, if error, did not affect the result of the trial, and hence was not reversible error. (Public Acts of 1911, ch. 32.) We say this for the reason that plaintiff proved the same fact more fully and in more detail by three witnesses (Joe Pigue,

Homer Overton and J. T. Anderson), without objection or complaint on behalf of defendant. The fourth assignment of error is overruled.

The fifth and sixth assignments are as follows:

"5. The court erred in permitting counsel in his closing argument to go outside of the record and discuss the facts of the old English Donkey case, and to read what counsel stated was the law in this State, said argument and reading being as follows:

" 'Away back in 1842, a peculiar case arose in England that started this very proposition I am talking about. There was a donkey belonging to a man and the fellow wanted the donkey to graze around, it may have been a dry time like we have had, and hobbled him at the side of the road, and the donkey grazed around and the grass, I guess got short, or he got full, and he lay down in the road and a fellow came driving along with a team of horses and a wagon, and ran over the donkey and killed him. That gave rise to the principle of law that has been recognized ever since that, and it has been so held not only by the State courts, but our Federal courts and every State in the Union. They said in that case that the driver could have seen, or ought to have seen the poor donkey was hobbled there and couldn't get away, and ought to have taken some pains to have gone around him or checked up a second or at least taken some precaution to stop and not kill the poor animal, as he did. The court said that is what he ought to have done, and the fellow had to pay for his want and omission of care. The court said that even if the donkey ought not to have been there on the public road, and there he was down, blocking the public road, and the fellow ran over the donkey.

" 'I am not comparing Mr. Steepleton to a donkey or putting him in place of the donkey, but it represents the principle of law involved in that very case. These men insist he has got no business being there. That he was there without a right to be there; but does that excuse them for their wanton negligence in not trying to save that man's life?'

"In commenting on that case, our court goes on to say:

" 'It is on such considerations that cases composing an exceptional class have been determined. We refer to those instances where the defendant is engaged in a business hazardous to the public in certain aspects, such as that of operating dangerous instrumentalities.'

" 'Just like these people were doing here, that become dangerous to the public;' . . . 'and where, therefore, the law imposes the duty on the defendant continuously to anticipate

that some other'—fellow—'may negligently subject himself to a peril from defendant as a source;'

" 'That they must look out for the fellow who is negligent, or, even put it foolhardy, enough to come into a dangerous situation of that sort, they are charged with the duty of being on the watch for just such fellows as come in that class. It says,—'

" 'Such a defendant is precedently, and continuously to the moment of injury.'

" 'The Marion Construction Company was precedently and continuously to the moment of the injury,'—'under the duty of lookout for the other, and his or its negligence in failing to discover the exposure of such a plaintiff and averting injury by the exercise of ordinary care is on grounds of policy considered to be proximate cause,' of the injury.

" 'The thing shifts to them, if the man was negligent when he went in there, it shifts and becomes what is called in this case here, a remote contributory negligence if these other men didn't do their duty, if they allowed the man to come down there and run into a blast. They could have stopped him. It was not a question of whether or not they could know it. They had a special mission to perform and a special purpose to protect the public traveling about there and going down there, from going into it at all.'

" 'Now, these two men represented the Marion Construction Company according to the testimony of Mr. Poteet, or rather these other, Mr. Irving, I think, stated that they went especially for that purpose and as the representatives of that Company.

"We say under all the circumstances, these men can't escape liability. They could have stopped the plaintiff if they had tried, and they didn't try in the way the law would require of them to do.

"Now, it is up to you gentlemen to decide whether or not they exercised that degree of care and prudence that they ought to have done under the law in preventing the injury. If you find that they did not, then this plaintiff is entitled to recover, and if he is entitled to recover, he is entitled to substantial damages. On the question of defendant's duty, this very book—this very law, down here says that—

" 'If during a period at or before the infliction of the injury adequate for preventive action by defendant'—'and they had 300 feet there that they saw the man coming in which to get out of the car and warn him, and didn't do it' . . '. 'he had actual knowledge of plaintiff's danger and he failed to exercise ordinary care to avoid it, all authority is to the effect that plain-

tiff may be awarded relief for then the negligence of defendant takes the color of wilfulness.'

"6. The court erred in not granting defendant's motion to withdraw and exclude from the jury, the reading of the law and argument thereon, said motion being in words and figures as follows:

" 'Mr. Travis: I move your Honor to exclude and withdraw from the jury, that part of counsel's argument where he reads from this case here the law, as supposed to be applicable to this particular case.

" 'Mr. Ligon: I except to the statement of counsel in making another objection.

" 'The Court: I think the court is ready to act upon that. The court will instruct the jury as to what the law is, and it will be the duty of the jury to take the law as is given in charge by the court. The fact that either side may have read from some law will not be considered by the jury unless it is in accordance with the law, which the court gives in its charge to the jury, and with that instruction to the jury the court is content with reference to that reading.' "

It cannot be doubted that plaintiff's counsel transgressed the rules of correct practice in civil cases when he related the facts of the "donkey case" (Davies v. Mann, 19 Eng. Ruling Cas., 190) to the jury, and read from the opinion in Todd v. Railroad (135 Tenn., 92, 185 S. W., 62).

But everything stated or read by plaintiff's counsel, so far as set forth in the fifth and sixth assignments of error, supra, is entirely consistent with the principles of law stated by the trial judge in his charge to the jury. In this view, and in the light of the court's instructions to the jury at the time the objection now under consideration was made, we do not see how defendant could have been prejudiced. Hence, the error is not ground for reversal. (Public Acts of 1911, ch. 32.)

"In jurisdictions in which the charge of the court is given after counsel have finished their argument, misstatements of the law by counsel could hardly be considered a ground for reversal unless sanctioned by the court, for it is the duty of the jury to take the law from the court." 2 R. C. L., p. 421, sec. 18.

The instant case is quite different from Pullman Company v. Pennock, 118 Tenn., 565, 102 S. W., 73, where counsel persisted, over objection sustained by the court, in reading to the jury opinions of courts in other cases stating the amounts of recoveries had and sustained in those cases.

The defendant's fifth and sixth assignments of error are overruled.

The seventh assignment is as follows:

"'The court erred in not granting defendant's motion for a mistrial when plaintiff's counsel asked Poteet the following question:

"' 'You have carried insurance with your Company all that time?'

"' 'Excepts to by the defendant.'

"'The Court: That exception is sustained.

"'Mr. Travis: We will ask your Honor to excuse the jury.

"'The Court: Well, I don't think it is necessary to excuse the jury, that improper question. The court has sustained your exception, and I instruct you, Gentlemen of the Jury, that you will not consider that question at all, that would not be material whether he carried insurance or didn't, it is highly improper to prove whether or not anybody carried insurance or didn't carry it.

"'Mr. Travis: We would like to be heard on that question.

"'The Court: I will let you do that.

"'Mr. Travis: We would like for the jury to be excused.

"'The Court: All right, gentlemen you may step out of the court room.''

(The jury passed out of the court room.)

"'Mr. Travis: Now, may it please the court, we want to move your Honor to enter a mistrial in this case at this time, for the reason that counsel for plaintiff has brought clearly to the attention of the jury, the fact of the insurance company.

"'Said motion, after argument of counsel for both sides, was by the court overruled and disallowed;

"'To which defendants excepted."

The record reveals no excuse for the act of plaintiff's attorney in asking the improper question challenged by the defendant's seventh assignment of error, supra; but the question here is whether it constitutes reversible error?

It is seen that the question asked the witness was not answered and the court promptly admonished the jury that they should not consider the question at all, etc. The mere question asked in this instance would not convey to the mind of a juror of average intelligence a new thought. "Insurance against loss or damage from accident or negligent conduct is so universal that jurors, as well as courts, must be assumed to be cognizant of this fact, and hence the evidence thereof will not be as likely to create prejudice as it might have been before this method of business became so universal." 56 A. L. R., 1548. To the same effect, see Whitfield v. Loveless, 1 Tenn. App., 377, 394.

In Ingolsby v. Burnett, 163 Tenn., 173, 176, 40 S. W. (2d), 1013, the court approved as sound in principle and supported by the decided weight of authority a statement of law quoted from 56 A. L. R., 1509-1511, as follows:

"In accord, however, with the better view, the majority of the courts hold that prompt exclusion of questions designed to elicit testimony with regard to insurance carried by the defendant, coupled with instructions to the jury to disregard the improper matter, sufficiently protects the defendant's rights, without requiring the judgment rendered to be reversed, especially if it can be said as a fact that the verdict was not affected thereby and the plaintiff does not persist in attempting to get the objectionable matter before the jury, and thus override the ruling of the court against him."

The seventh assignment of error is overruled.

The defendant's eighth assignment is that the court erred in instructing the jury when said jury returned to the court room for further instructions, said instruction being in words and figures as follows:

"I stated that if he did not use such care and caution under the general charge with reference to negligence and that his negligence contributed proximately to the injury, that he would not be entitled to recover unless you should be of the opinion that under the last clear chance doctrine, which I charged you, that is, that the folks saw him and he stopped there and that they had an opportunity to give him fair and timely warning to keep him from rushing onto peril after he was caught in a perilous condition. That if that doctrine applied, that the question of his negligence would not bar a recovery."

It appears from the record that after the jury had retired to consider the case, they returned into court and reported that they had not agreed on a verdict, whereupon, at the direction of the court, they again retired and later came into court a second time and asked for further instructions, which the trial judge undertook to give them, and it was on this latter occasion that the instruction was given which is challenged by defendant's seventh assignment of error.

However, the instruction copied into the seventh assignment does not embrace all that the court said to the jury at that time, and the instruction criticised cannot be properly understood and interpreted without taking into view other things said in the colloquy between the judge and the jury appearing in the bill of exceptions under the heading "Second Report of the Jury," as follows:

"(The jury came back and asked for special instructions)

"Juror: 'Whether the sign which some of the witnesses stated was up, saying "Road Closed," was a sufficient sign to close the road, is one little question we have got that has been giving us some trouble. Is that enough sign for a person to stay off?'

"The Court: 'Let me have those requests back that I handed to you, gentlemen. I think I can frame what I want to say from them.'

"Juror: 'While you are looking for that, I might say that another question we could not agree about was what degree of caution the plaintiff was required to exercise.'

"The Court: 'I stated to you gentlemen that it was a duty of the plaintiff to use that degree of care and caution that an ordinarily prudent man would use under like condition.'

"Juror: 'And if he failed?'

"The Court: 'I stated that if he did not use such care and caution under the general charge with reference to negligence and that his negligence contributed proximately to the injury that he would not be entitled to recover unless you should be of the opinion that under the Last Clear Chance Doctrine, which I charged you, that is, that the folks saw him and he stopped there and that they had an opportunity to give him fair and timely warning to keep him from rushing onto peril after he was caught in a perilous condition, that if they failed to do that and if that doctrine applied, that the question of his negligence would not bar a recovery.'

" 'I probably should have charged you, and do charge you now, that if you should be of the opinion that he was remotely negligent, that is, that he was guilty of some degree of negligence but that that was not the proximate cause of the injury to him, that then you should consider that negligence, in the event you found him entitled to damages, in mitigation of his damages, and that they would be mitigated in accordance with the amount of negligence that might be found to have been engaged in by him in a remote way and not as proximately contributory negligence.'

" 'Do you think you sufficiently understood the charge on the Doctrine of Last Clear Chance?'

"Juror: 'This last question I have asked especially was the most important one to our investigation.'

"The Court: 'I did state in substance this, that whether or not that was a sufficient notice to warn him that the road was closed was a matter to be considered by you under the instructions given. That is; that the only thing necessary for the State to do was to put up a Road Closed sign, notifying people not to travel that way, but that a reasonably prudent man would

act, of course, under the conditions that were in front of him; that is, whether the road was being used by the public in traveling to and fro, or was not being used and whether or not he saw the sign or should have seen it by the exercise of ordinary care, was a matter for you, gentlemen, to pass on.'

"Mr. Ligon: 'Now, your Honor, I don't know whether your Honor made it very clear on the question of Last Clear Chance.'

"The Court: 'Yes, they do not ask any further instruction. I have given them what they asked and all they have asked for. Go back, gentlemen of the jury, and see if you can agree, and come back and report your verdict if you can agree, and if you cannot agree within a reasonable time, report that fact.' "

The foregoing questions asked by the jury and the additional instructions given by the court should be construed in the light of the fact that in his principal charge (to which there is no exception) the learned trial judge had instructed the jury at length, and in a clear and lucid manner, with respect to the law of contributory negligence and the doctrines of "last clear chance" and "discovered peril," as applicable to the facts of this case. He had not, in the main charge, instructed the jury on the subject of remote contributory negligence of plaintiff, and hence he added instructions on this subject, which are not criticised.

It is seen that in his additional instructions challenged by the eighth assignment the court referred the jury to his "general charge" in such way that the jury must have understood that the additional instructions were to be read in connection with the general charge.

We will not further extend this opinion by reviewing the charge and the additional instructions in detail, but will content ourselves with the statement that we are of the opinion that the additional instruction of which defendant complains through his eighth assignment, supra, is, like the main charge, in harmony with and supported by the opinion of the Supreme Court in the case of Todd v. Railroad, 135 Tenn., 92, 185 S. W., 62, as interpreted in Tenn. Cent. Railway Co. v. Ledbetter, 159 Tenn., 404, 409, 19 S. W. (2d) 258.

Defendant's ninth assignment of error purports to contain a copy of a special request for instructions to the jury, described as "defendant's special request No. 1," and it is asserted that the court erred in refusing to charge said request. This assignment must be overruled for the reason that it does not sufficiently appear from the record that such request was at any time tendered to the trial judge below. It appears nowhere in the record except in the defendant's motion for a new trial, which is a mere pleading and not evidence. Frazier v. State, 117 Tenn., 430, 450, 100 S. W., 94; Sherman v. State, 125 Tenn., 19, 49, 140 S. W. 209; Richmond, etc.,

Foundry v. Carter, 133 Tenn., 489, 493, 182 S. W. 240; T. C. Railroad Co. v. Vanhoy, 143 Tenn., 312, 334, 226 S. W., 225; Crosswy v. State, 157 Tenn., 363, 374, 8 S. W. (2d), 486.

The tenth assignment is that the verdict is excessive, and so excessive as to evidence prejudice, passion and caprice on the part of the jury.

There is evidence that plaintiff's automobile was worth $500 at the time it was damaged, and that plaintiff sold it as junk for $38, and there is no evidence that this was not its value; hence the jury allowed plaintiff $462 for his automobile.

Plaintiff received two broken ribs, two scalp wounds, a blow on the hip from which he suffered for some time, a wrenched shoulder which was still painful at the time of the trial, and plaintiff testified at the trial that he still suffered with nervousness and headaches, with which he was not afflicted before the injury for which he sued in this case. We do not think that the amount of the verdict evidences prejudice, passion or caprice on the part of the jury, and the tenth assignment is overruled.

The eleventh, and last, assignment is that the court erred in entering judgment in the sum of $1,250 in favor of the plaintiff and against the defendant.

This latter assignment is too general and indefinite to constitute a good assignment of error, and it is therefore overruled.

This disposes of all the assignments of error. They are all overruled.

It results that the former judgment of this court, entered on November 7, 1931, striking the case from our docket, is vacated and set aside, and the judgment of the circuit court is affirmed. A judgment will accordingly be entered here in favor of the plaintiff A. E. Steepleton and against the defendant Marion Construction Company for $1,250, with interest thereon from the date of the judgment below (August 1, 1931), and for the costs of the cause accrued in the circuit court. The costs of the appeal will be adjudged against the Marion Construction Company and the surety on its appeal bond.

Crownover and DeWitt, JJ., concur.