CENTRAL COAL & COKE COMPANY v. ORWIG.

Opinion delivered December 5, 1921.

1. CORPORATIONS—FOREIGN CORPORATIONS—RESIDENCE.—Crawford & Moses' Dig. §§ 1826-27, providing that a foreign corporation shall designate its general office or place of business in the State and name an agent upon whom process may be served, and shall consent that service of process may be had upon any agent of the company or upon the Secretary of State, *held* not intended to confer a local residence upon such corporations, but only to provide remedies for those who may have causes of action against them in this State.

2. REMOVAL OF CAUSES—CITIZENSHIP.—Where a cause of action was brought in a State court in a county situated in the Western Federal District by a resident of such district against a foreign corporation doing business in this State and having in the State an agent designated upon whom process might be served, the defendant was not entitled to have the cause removed to the Eastern Federal District upon the ground of diversity of citizenship.

3. MASTER AND SERVANT—PERSONAL INJURY—QUESTIONS FOR JURY.— Under the evidence in a personal injury case, *held* that the issues of negligence, contributory negligence and assumed risk were for the jury.

4.  TRIAL—IMPROPER ARGUMENT—PREJUDICE.—An improper reference, in an attorney's argument in a personal injury case, to the fact that an insurance agent was sitting beside defendant's counsel was cured by a direction to the jury to disregard such remark.

Appeal from Yell Circuit Court, Danville District; *A. B. Priddy,* Judge; affirmed.

*James B. McDonough,* for appellant.

1.  The petition for removal should have been granted.  The appellant is an inhabitant and resident of the Eastern District of Arkansas, within the meaning of the act of Congress.  4 Fed. Stat. Ann. p. 838; 5 *Id.* p. 16; *Id.* p. 846; U. S. Stat. at Large, Vol. 36, p. 1101.  Yell County, in which the suit was brought is, under the act of Congress, in the Little Rock Division of the Eastern District of Arkansas, and appellant could have been sued originally in the United States District Court of that division and district.  The act of 1907, requiring a foreign corporation desiring to do business in this State to consent to service upon an agent, etc., applies to Federal courts as well as State, and as a matter of law makes the corporation consent to be sued in the Federal courts.  The act is valid.  108 Ark. 562.  The words "inhabitant," "found" and "residence" are synonymous.  230 Fed. 968; 193 *Id.* 728; 145 U. S. 444; 27 Fed. Cas. 486.  See also 48 Fed. 202; 29 Fed. 17; 6 Sawyer, 262; 45 Fed. 345: 57 *Id.* 529; C. & M. Dig., §§ 1825 to 1831 incl.; 48 Fed. 1; 179 *Id.* 569.  A foreign corporation is "found" in the district, and has a residence therein, if it may be served in the district.  69 Fed. 704; 199 *Id.* 927; 7 *Id.* 139; 21 *Id.* 288; 39 *Id.* 290; 41 *Id.* 833; 49 *Id.* 297; *Id.* 884; 117 *Id.* 732; 179 *Id.* 556.

The residence of a corporation is any place where it has a service agent.  3 Thompson on Corporations, § 3014; 51 Mo. 308.  The Legislature of the State has determined that the corporation may be sued in any county in the State, and appellant having consented thereto has therefore consented that it might be sued in the Fed-

eral court.  96 Am. Dec. 183; 9 N. H. 394; 40 N. J. L. 111; 42 *Id.* 490; 170 U. S. 100; 172 U. S. 602; 89 Fed. 121; 92 *Id.* 3.

The suit was brought in Yell County for the sole purpose of defeating the right of removal to the Federal court and was therefore fraudulent.  22 L. R. A. (N. S.) 1235.

2.  The circuit court of Yell County was without jurisdiction to hear and determine the case.  § 11, art. 12, Constitution; §§ 1825-1832, C. & M. Digest; § 1171 C. & M. Digest, and cases cited; *Id.* §§ 1164, 1165, 1174.  To give a domestic corporation the right to be sued in its own county (C. & M. Dig. § 1171) and deny that right to a foreign corporation doing business in the State is to discriminate against the foreign corporation, in violation of the State Constitution and of § 1 of the 14th Amendment to the U. S. Constitution.  The statute is void, 252 U. S. 60; 241 U. S. 329; 249 U. S. 522.

3.  Non-expert witnesses may state facts only; they cannot give opinions as experts.  125 Ark. 86; 95 *Id.* 310; 19 *Id.* 533; 23 *Id.* 730; 1 Elliott on Ev. §§ 675, 676 and cases cited; 122 Am. St. Rep. 580.

4.  It was improper and prejudicial to refer, in argument to the jury, to the witnesses of the defendant as a gang.  31 N. Y. S. 926; 82 Hun 349.  The use of this word was reversible error.  61 Ark. 130; 82 S. W. 562; 80 Ark. 23; 63 *Id.* 174; 70 *Id.* 305; 180 S. W. 474.  The reference to W. L. Leavy as an insurance agent, he not being a witness in the case, and there being no testimony that he was an agent of an insurance company was wrongful, harmful, and constituted reversible error, even though the court attempted to cure them.  80 Ark. 158; 87 *Id.* 461; *Id.* 515; 89 *Id.* 58; 104 *Id.* 1; 114 *Id.* 542; 131 *Id.* 6; L. R. A. 1915-A, p. 155, note; 196 S. W. 606; 104 *Id.* 384; 177 N. W. 217; 175 *Id.* 470; etc., etc.

5.  The verdict is contrary to the clear weight of the testimony, and the fact that the trial judge over-

ruled the motion for new trial ought not, in the light of the affidavit appearing in the addition to the bill of exceptions presented by the appellant, to be taken as a finding by the trial judge of a preponderance in favor of the plaintiff. 126 Ark. 427; 133 *Id.* 166; 136 *Id.* 45.

*Wilson & Chambers* and *John W. Goolsby*, for appellee.

On the question of removal, this court has frequently held contrary to appellant's contention. 129 Ark. 550; 98 *Id.* 507; 107 *Id.* 512. Appellant, being a Missouri corporation, has no residence in this State. 140 Ark. 135; 253 U. S. 325. Neither the plaintiff, a resident of Sebastian County, nor the defendant, a Missouri corporation, was a resident of the Eastern Federal District of Arkansas. That the act providing that an action may be brought against a foreign corporation in any county in the State is constitutional, has been settled by the decisions of this court. 140 Ark. 135.

WOOD, J. This is an action by the appellee against the appellant to recover damages for alleged personal injuries. The appellee alleged in substance that the appellant is a corporation doing business in Arkansas and operating a coal mine at Hartford; that appellee, on the 21st of July, 1920, while working in the mine, was injured by coming in contact with a wire charged with electricity, which wire, through the negligence of appellant, had not been insulated or protected in any way, but left exposed in a manner to be dangerous to the employees; that the appellee, without any fault or carelessness on his part, while engaged in the discharge of his duties, came in contact with the same, causing his injuries, which he set forth in detail, to his damage in the sum of $20,000, for which he prayed judgment. The appellant filed a petition and bond, which were in due form, for removal of the cause to the United States District Court. The trial court denied the petition, to which appellant duly excepted.

1.  This presents the first question for our consideration which must be determined by the decisions of the Supreme Court of the United States.  The question has been settled by the decisions of our own court and also by the decisions of the Supreme Court of the United States adversely to appellant's contention.  *St. L. S. & F. R. Co.* v. *Kitchens,* 98 Ark. 507; *C. R. I. & P. Ry. Co.* v. *Smith,* 107 Ark. 512; *Central Coal & Coke Co.* v. *Graham,* 129 Ark. 550; *Pekin Cooperage Co.* v. *Duty,* 140 Ark. 135; *Boston, etc. Mining Co.* v. *Montana Ore Co.,* 188 U. S. 632; *Ex parte Wisner,* 203 U. S. 449; *In re Winn,* 213 U. S. 458.

The petition for removal alleges, among other things, "that within the meaning of the removal act of Congress your petitioner has a venue residence both in the Eastern District of Arkansas and in the Western District of Arkansas, and may be sued in either district in the Federal courts thereof."  It is further alleged that the appellant "has a service agent in the State of Arkansas as required by the laws of this State upon whom service of process may be had, and that under the law of Arkansas the appellant could be sued by the appellee in the United States District Court at Little Rock and also at Ft. Smith."  Our statutes require a foreign corporation to designate its general office or place of business in the State and to name an agent upon whom process may be served (Sec. 1826, C. & M.).  And also requires such corporation to consent that service of process may be had upon any agent of the company or upon the Secretary of State.  (Sec. 1827, C. & M.)

These statutes prescribe the conditions upon which foreign corporations can do business in this State, and were not intended to, and do not, confer a local, State or county residence upon them.  These statutes were intended to provide remedies for residents of this State against foreign corporations, or corporations that have no residence in and are not inhabitants of this State.

Sec. 11, article 12 of our Constitution as to foreign corporations authorized to do business in this State

among other things provides: "As to contracts made or business done in this State, they shall be subject to the same regulations, limitations and liabilities as like corporations of this State." And section 1828 of Crawford & Moses' Digest provides among other things: "Such corporations shall be entitled to all the rights and privileges and subject to all the penalties conferred and imposed by the laws of this State upon similar corporations formed and existing under the laws of this State." But the above provisions do not make foreign corporations residents or inhabitants of this State in which they are authorized to do business.

Our statutes designating the agents and fixing the forums in which foreign corporations may be sued do not take away any of the rights guaranteed to foreign corporations under our Constitution. They relate only to the remedies provided for those who may have causes of action against them in this State. See *American Hardwood Lbr. Co.* v. *Ellis & Co.*, 115 Ark. 524. "Foreign corporations have their legal existence and are located within the boundaries of the State under whose laws they are organized." *Pekin Cooperage Co.* v. *Duty, supra.* Neither the appellee nor the appellant was a resident of the Eastern Federal District of Arkansas where the action was brought. Since, therefore, the appellant was not a resident or inhabitant of the Eastern Federal District of Arkansas, but had its domicile or residence in a foreign State, it had no right to remove the cause of action under the removal acts of Congress. 5 Fed. Stat. Ann. p. 16 Sec. 28; 5 Fed. Stat. p. 486, § 51 (Judicial Code).

2. After the petition for removal of the cause was denied, the appellant answered and denied that the appellee was injured in the manner set forth in his complaint and also denied specifically the allegations of negligence contained therein, and set up the affirmative defenses of contributory negligence and the assumption of risk on the part of the appellee. The trial resulted in a verdict and judgment in favor of the appellee

in the sum of $5,000. The appellant contends that the evidence was not sufficient to sustain the verdict, and that the trial court erred in refusing to give a peremptory instruction directing them to return a verdict on the above issues in its favor. The facts developed at the trial on these issues are substantially as follows:

The appellee was working in the appellant's coal mine No. 4 in Sebastian County, Arkansas. He was driving what was known as the "fourteenth east entry" loading coal out of that entry. Two men were working together. The entry was being driven so as to prepare for rooms and develop the airway. The coal in the entry is undercut by a coal machine. It is then shot down by the shot-firer and removed by the diggers. The electricity is conducted to the machine by copper wires. The row of posts carrying the wires was about three feet from the lower rail of the dip switch. The dip switch turned off from the track into the back entry to air course and goes down the heading. Canvas curtains were attached to the same posts that the wires were attached to, but not on the same side of the post that the wires were on. These curtains were put up to block the air currents and turn them into the working places. The wires are put on the posts, the positive wire on one side and the negative on the other. The posts bearing the wires are placed between the lower rib, or wall, and the track. The dead or return wire is on the side of the posts next to the track, and the live wire is on the other side. The live wire was extended down the track something like ten or twelve feet further on the posts than the dead wire. There was no purpose in so extending it. It was not worth anything from the point where the dead wire ended to the live wire's extended end, but, so far as the electricity was concerned, it was just as dangerous beyond the end of the dead wire as it was back of it. The appellee did not know before his injury that the live wire was thus extended. The appellee had put wires in the slope air course, but had never stretched one inch of

wire in the fourth east entry, unless it was up at the fourteenth east air course. The fourteenth east entry branches off from the slope. The appellee had acted as a lineman, whose duty it was to put wires up for the machine—the live wire and the dead return wire. Appellee was not there when the machine men made the cable and did not remember anything about the machine men, except when they were in his entry or place cutting. He didn't know at what point they had stopped the wire. The appellee was familiar with the manner of fastening the cable nips to the power wires. It would be practical to put the nips on the end of the power wire. If witness or any other man should discover the cable hooked to the power wires back behind where he was working, that would indicate to him that the end of the power wires was back where the connection was made. The appellee did not have any means of knowing, without an investigation, that one of the power wires extended further toward the face than where the nips were hooked on.

The appellee thus describes the manner of his injury: "We were at our working place performing our duty. The driver had given us a back switch, placing us an empty car to receive a load, which we did, and pulled the load out of the back entry, and in so doing the mules backed, dragging the cable down. I was holding the weight of the car with both hands pushing the car in. Naturally my 'buddie' (fellow worker) was going to drop in on the back end with me to help me with the knuckle, as we call it, and frog, and, instead of him returning with me as I expected, he hallooed, 'Wait a minute, the machine cable is down.' Probably the car was along about the frog at that time. Then he put the cable up on his side, which is in between the two tracks, the top entry track and the lower entry switch. He put the cable up that extends into the entry on his side and remarked, 'Here,' or something like that, calling my attention. I stepped up to the side of the car, as innocent as a little dove, hanging

that cable up on the board trying to get it to fasten up there. There was a little nail in there, probably a sixpenny nail, which the weight of the cable had bent down until it would hold the cable no longer. The board that had been put up to support the canvas across the entry was sticking up there, and it was down probably an inch, one-half inch, or something like that, I don't know how far, but that is the first thing I thought of—stick you in there and you will be out of my way. This is no place for you. I held the cable with this hand trying to pull the slack cable up from this entry along to me as a man would a lariat rope, trying to get enough cable up so as I could place it up to keep it from coming out from this board; when doing so, I had no place to put it—it wouldn't stay. My thought was next, stick you over this curtain, and you will stay there probably—your own weight will hold the weight there naturally, and in doing so I came in contact with that live wire in this arm, and it knocked me absolutely as dead and as cold as a wedge.''

The appellee's testimony further shows that he was endeavoring to pick up the cable to keep the car from running on to it and cutting same in two, which would have rendered the situation of appellee and his fellow worker very dangerous. His testimony shows that it was his duty and the duty of others operating in the mine to pick up the cable. There was supposed to be no danger connected with this. The appellee stated that he did not know that the live wire from which he received the shock was behind the canvas. He then testified that there were several different ways to have protected the wire; that it could have been an insulated cable It could have been put, if necessary, five or six feet from the rail, instead of three. There could have been a board nailed between the workman and the wire, which would have prevented the man from coming in contact with the wire and make it absolutely safe. The appellee then describes his sensation when

he returned to consciousness and his physical condition before and after the alleged injury.

His testimony further shows that his arm came in contact with the wire somewhere about the wrist or an inch from the wrist joint. There was no burn. At the time of his alleged injury he had on gum boots and woolen socks. The boots had holes in them both in the bottom and in the sides. The appellee at the time was standing on a muck or mud bottom—inclined to be damp. He stated that the place where he was injured was not wet, but that none of it was perfectly dry. It was counted dry, and there was dry dusty coal—there was no water standing at the place where he was hurt.

One of the witnesses on behalf of the appellee testified that he went back to the place where the people were surrounding the appellee at the time he was injured. He found them about three or four feet from the curtain up toward the dip switch. Appellee was up on an entry—the main entry—sitting down on his knee and had his hands down. He was next to the face from the curtain coming across the main entry. The car was under the dip switch curtain and turned into the dip switch. It had six or seven props in there. Witness and one Pete Coffman helped to unload the props so they could put appellee in the car to send him out of the mine. The wire could not have been seen by a person standing at the place where witness found appellee, because the curtain was hanging between him and the wire. The wire was not insulated. It was the hot wire. It carried a dangerous current of electricity. There was nothing between the two props that the wire was fastened to, to prevent a person from coming in contact with the wire. If they had nailed a couple of boards on the two props horizontally, this would have protected a person from falling against the wire.

Another witness testified that he assisted in hanging the wire in question; that the wire was laid back beyond the dead wire and stretched up. "We stretched them to this dip switch and stopped at a point a dis-

tance from the track which was safe for everybody, and in that particular instance we had a few feet of wire that extended beyond that prop, and we turned it back and wrapped it around itself. If we had stopped this live wire at the end of the dead wire, we would have had possibly twelve feet to wrap back. It would have been just as practical to wrap this amount back as it was the little amount we did wrap back. The nips could have been used on it just as well. If the live and dead wires both extended the same distance, you would have reached the dead wire before you reached the live wire in stepping toward them. The dead wire is harmless."

This witness further testified that, if a ten-inch board had been nailed on the opposite side of the post from the wire, that would probably have made it safer to people working in the entry in keeping them from coming in contact with the wire. This witness also testified that he had been shocked by electric wires in the same mine when they were charged with 250 volts; that the only injury he had received from it was that it knocked him down. Another witness also testified that he had been knocked down two or three times by the direct current from the electric wires in Mine No. 4, but was never burned with any of them.

On behalf of the appellant, there was testimony to the effect that it was impossible for a man to put his hand against the live wire if he stood in the angle of the curtains where the appellee said he stood. The witness went into detail as to the condition and the situation of the mine at the time and place the appellee is alleged to have been injured. The appellant also introduced the testimony of a medical expert who had had occasion to study and treat injuries due to electricity. He, in company with other physicians, had examined the appellee. He found no physical injury of any kind whatever, no evidence of any burn from electricity, and found the plaintiff normal in every way. In his opinion the plaintiff was a malingerer. This examination

was made long after the injury and just before the trial, the examination being authorized by the court.

Two other physicians, experts, testified. One of them had been called to treat the appellee at the time of his injury. He found him complaining and trembly and apparently exhausted from some cause, claiming that he had been in contact with an electric wire. He made a diagnosis of his case in the usual way and found that he had the same symptoms of a person recently after a shock who had been struck by lightning. He stated that appellee had no organic trouble that he knew of, but that he seemed to be "all down and out" and witness was unable to explain why. At the time of the trial appellee didn't seem to be sick at all, but he was weak and emaciated. The physician gave it as his opinion from the history of the case that the cause of appellee's weak and run-down condition was the electric shock. The other physician who had also examined the appellee testified substantially to the same effect.

There was testimony to the effect that the appellee, before he received the injury, was "healthy, strong, energetic, a good worker and enthusiastic." At the time of the alleged injury he weighed 158 pounds and at the time of the trial he weighed 136 pounds. There was also testimony to the effect that appellee was known in the community as a good man; was the president of the Red Cross unit at Hartford during the war, and was exceedingly active in all the Liberty drives for the sale of bonds—was a leader in all these things.

The above facts speak for themselves. Without discussing them in detail, it suffices to say, giving them their strongest probative force in favor of appellee, they show that the issues of negligence, contributory negligence and assumed risk were issues for the jury. The court did not err therefore in refusing appellant's prayer for a peremptory instruction.

3. The court gave instructions, numbered 1 to 22 inclusive, embracing therein instructions on its own

motion and certain prayers for instructions requested by the appellant and also certain prayers requested by the appellee. These instructions covered the evidence adduced at the trial. They correctly announced familiar principles of law applicable to the issues of negligence, contributory negligence and assumed risk, and were in accord with the well established doctrines on these subjects as they have been announced in numerous former decisions of this court. Appellant presented seventeen prayers for instructions which the court refused. Such of these as were correct, the court covered in the instructions it gave. We find no error in the ruling of the court in the giving and refusing of prayers for instructions.

4. During the opening argument before the jury, one of the attorneys for the appellee referred to W. L. Leavy as "an insurance agent setting beside Mr. Mc-Donough." The appellant objected to the statement on the ground that it was wrongful, harmful and erroneous, the said W. L. Leavy not being a witness in the case and there being no testimony that he was the agent of an insurance company. The appellant asked the court to instruct the jury to disregard the statement. The court did this, stating to the jury that there was no evidence that Leavy was an insurance agent, and that the jury should disregard the statement. The appellant duly saved its exception "to the making of the unfounded and erroneous remark" by counsel for the appellee. The remarks of counsel were highly improper. See *Williams v. Cantwell,* 114 Ark. 542; *Pekin Stave & Mfg. Co. v. Ramey,* 104 Ark. 1. But it does not occur to us that they were so flagrant as to produce a deep-seated and irremovable prejudice in the minds of the jury. To so hold would impeach the jury of a desire or willingness to give heed to the remarks of interested counsel, rather than to follow the instructions of the impartial judge, and this too notwithstanding their oath to decide the case according to the instructions of the court and the evidence adduced by the witnesses. A sensible and

honest jury is not likely to be swerved from the path of duty by such conduct on the part of counsel. The court promptly complied with the request of counsel for the appellant to instruct the jury not to consider the remarks of counsel for the appellee. The statement of the court in the presence of the jury that there was no evidence that Leavy was an insurance agent and to disregard the statement of counsel to that effect would, we believe, remove all prejudice in the minds of the jury that the remarks might have produced.

The appellant objected to certain other remarks of counsel for the appellee, all of which we have considered. But we do not find any errors prejudicial to appellant in the rulings of the court concerning the remarks of counsel. There are many other assignments of error in the motion for a new trial, which have been ably presented in the elaborate brief of counsel for the appellant. We have considered all of these assignments, but it would unduly extend this opinion to discuss them, and we deem it unnecessary to do so.

After a careful consideration of the whole record we find no error prejudicial to the appellant in any ruling of the trial court, and its judgment must therefore be affirmed.