## LA FOLLETTE v. STATE.

Eastern Section.   February, 1932.

Petition for Certiorari denied by Supreme Court, April, 1932.

Divine & Guinn and Thos. E. Mitchell, all of Johnson City, for appellant.

R. M. May, of Jonesboro, for the State.

SNODGRASS, J.   This is a bastardy proceeding starting before a justice of the peace in the voluntary swearing out of a warrant,

by the mother of the illegitimate child, under the statute. The defendant was arrested and tried, and upon the case coming into the county court an issue was made as to the truth of the accusation and the cause tried before the county court, where it was dismissed, and from thence by appeal to the circuit court where, without the intervention of a jury, it was tried before his honor, Judge D. A. Vines, with the results indicated.

After his motion for a new trial was made and overruled, the defendant appealed the case to this court, making assignments of error as follows:

"I. There is no evidence to support the judgment of the court.

"II. The judgment of the court is contrary to law.

"III. The great preponderance of the evidence is against the guilt of the accused and in favor of his innocence.

"IV. Because the statutory requirements relative to cases of this character was not complied with preceding the institution of this cause before the justice of the peace.

"V. The learned Trial Judge erred in reversing the judgment of the County Court for it held that by a great preponderance of the evidence the defendant was not guilty of the bastardy charge laid against him in this cause.

"VI. The learned Trial Court erred over the timely objection of defendant in admitting in evidence a post card for the reason that same was not signed by anyone and especially this defendant, that he had no connection with the writing thereof in any way and upon the whole the same was not substantive evidence tending to prove the charges laid against him.

"VII. Because the complaining witness, Bessie Tittle, was not corroborated by any material testimony tending to prove that the (defendant?) was the father of the child in question."

Taking up the assignments in their inverse order, we think the seventh assignment is not well taken. It is not absolutely essential that she be corroborated; but if it is, we think she is corroborated in her testimony. The assignment is therefore overruled.

The sixth assignment does not comply with the rules in failing to set forth the testimony furnished by the alleged postal card. But regarding the insistence that the same was not signed by anyone it was sought to be identified as to its author by the handwriting and such proof offered in relation thereto as that the court was not in error in admitting it, so that the objection to its introduction really mitigates against its weight than against its competency.

As the trial upon appeal was de novo in the circuit court, assignment No. 5 can have no greater efficacy than the one embodied in assignment No. 3.

We do not think the fourth assignment is material. It appears

to be a misdemeanor to fail to file such birth certificates, but we do not think the requirement was intended to affect bastardy proceedings.

The second assignment is too general, and the first is not well taken, so it appears that the case is to be determined upon the third assignment, which insists that:

"The great preponderance of the evidence is against the guilt of the accused and in favor of his innocence."

Upon this assignment we have considered the case upon its merits, and our examination of the proof leads us to the conclusion that the judgment of the circuit court is well supported by the preponderance of the proof. The prosecutrix was living with her father and bore a good character and seems to have had a sweetheart in the army.

When she first got acquainted with the defendant, who was a married man, he commenced to deliver ice and coal at their little store and residence in Johnson City. She testified that he commenced talking to her and making love to her in 1928; that he told her he was a single man and that she thought so for a long time, and that finally after he had been coming to see her and courting her for some time they began to have sexual intercourse and that this went on for some time until about the last of May or June, 1929, when she became pregnant and gave birth to a child on the 10th day of March, 1930; that the defendant Jessie La Follette is the father of her child and that all this illicit relationship occurred in Washington County, and that she had been virtuous except for such relationship with the defendant; that she was about twenty-six years old at that time; that the defendant had, on numerous occasions, promised to marry her and continued to see her until a short time before the child was born.

She further testified that along in July, 1929, she was taken sick and that her parents called Dr. Preas, who examined her and gave her treatment but didn't tell them what the trouble was; that the defendant came to see her at the time and suggested that he was going to send Dr. J. T. McFadden to see her, which he did, and when Dr. McFadden came and examined her he told her parents that she was pregnant; that when the defendant came to see her he handed $10 to her mother and told her to pay Dr. McFadden when he came; that the defendant came to see her after the child was born on at least two occasions; that he gave her and her mother as much as $80 during that time.

She testified that she was a poor girl and that her family was without means, her father having failed in his little business.

She further testified that she and one Roy Crockett, a soldier boy, had been sweethearts; but that he had gone away to the army and was to return and marry her Christmas, 1929; that he came

on a furlough in August, 1930, and that was the first time she had seen him in two years, and because of her condition they did not marry; that after defendant learned of her condition he procured medicine for her and she learned it was for the purpose of an abortion; that it consisted of a liquid, reddish in color, and some brown pills; but that she would not take the medicine when she learned of its purpose; that when she advised the defendant of her condition, he revealed to her that he was a married man but promised her if she would not tell who the father of the child was he would take care of her and furnish her money.

She further testified that after the child was born, the defendant and his wife separated for a short time and he went away, and that in April, 1930, while he was away, she received a post card from him, marked Bristol, Virginia, which was as follows, addressed to "Miss B M ———, 220 Highland Ave., Johnson City, Tenn."; the body of the card reading: "Dont u let iny one see this whin I am so lonsom I will drop you a few lines I hope this will fin you and the baby O. K. I would like to see you for I have got something to tell you when I see you. from your new Pal."

She testified that this post card was in the handwriting of the defendant, that she was acquainted with his handwriting, and that it was addressed as he had addressed other letters to her. And the card was filed as exhibit to her testimony.

She denied that she had shown Dr. Will Preas a photograph of Roy Crockett and told him he was the father of her child; she admitted she was acquainted with Mrs. Fontaine of 224 Highland Avenue, Johnson City, and that they were on friendly terms, but denied that she had told her that Roy Crockett was the father of her child. She admitted that Mrs. Fontaine had tried to get her to tell, but said she evaded answering the questions; she admitted she was acquainted with Mrs. Tolley and that they were on friendly terms, but denied that she told her that Roy Crockett was the father of her baby; she admitted she was acquainted with Mrs. Whitecloud, but denied that she stated to her that if Jess La Follette was the father of her child that she would take it out and kill it.

She admitted that she refused to tell these parties who the father of her child was because she had promised the defendant, after he had told her he was married and had promised to furnish her money, that she would not tell who the father was, and she tried to evade the question and get around answering it when these parties asked her. She exhibited a picture of Roy Crockett and filed the same as "Exhibit B" to her testimony. She denied that she had been car riding with any other man except the defendant.

We have given the full import of the testimony of the prosecutrix. It has the ring of truth and is circumstantially corroborated. As

a matter of fact, she did not tell any of these witnesses that Roy Crockett, who does not seem to have had a chance to become the father, was the father of her child. When talking to them she showed the picture and said he might be the father, which is far and away from a declaration that he was. Her testimony is consistent with her efforts to keep the name of the father secret and to evade if she could the curiosity of her friends. Her mother corroborates her as to her association with defendant, and lack of association with or opportunities of others to become the father of her child, and as to his being there and giving her $10 to pay Dr. McFadden whom he was to send.

Defendant admitted delivering coal and ice to this home, but denied he had ever had sexual intercourse with the prosecutrix and denied being the father of the child. He admitted having loaned them money, said he had handed Bessie Tittle and her mother money on several occasions, but that it was a loan in each instance, but he didn't take any note from them for it, claimed to have a note from Bessie's father for $40. He admitted that he hadn't loaned anybody else money in the last ten years except the Tittle family; that he was a poor man and had no money to loan. He admitted that shortly after the baby was born he and his wife had a disagreement and that he left on a trip. He denied writing the postal card and said he knew nothing about it and was not in Bristol at the time and thereupon, upon request and by agreement of himself and counsel, agreed to write on a separate sheet of paper furnished him what might be dictated to him, and thereupon he wrote at dictation the paper filed as ''Exhibit A'' to his testimony.

Without undertaking to discuss the testimony further, we think the clear weight of the proof supports the judgment of the court. The assignments are, therefore, all overruled and the judgment of the court affirmed, with costs against appellant and his securities on the appeal bond, who will also be included with defendant in that part of the judgment providing for the payment of $40 at the present time for the first year's support and for $30 one year from this date for the second year's support, and for $20 two years from this date as support during the third year; this being merely an addition to the judgment rendered in the circuit court, which is in all things affirmed, with executions ordered in conformity. Costs accruing up to and in this court will be collected by execution issuing from this court.

Costs that may accrue hereafter including the judgment, will be collected in the county court, and the cause will be remanded to the county court as provided in the judgment of the circuit court for further proceedings in harmony therewith.

Portrum and Thompson, JJ., concur.