# LASATER LUMBER CO. et al. v. HARDING.—189 S. W. (2d), 583.

Western Section at Jackson. October 31, 1944.

Petition for Certiorari denied February 3, 1945.

298

Cate & Cate, of Nashville, and Wayne A. Cox, of Paris, for plaintiffs in error.

Van Dyke & Dunlap, of Paris, for defendant in error.

KETCHUM, J. This is an action brought by Harding against the Lasater Lumber Company and Eulos Jones for damages for personal injuries sustained by him in a collision between a buggy in which he was riding and a lumber truck owned by the defendant Lasater Lumber Company, and driven by its servant Eulos Jones. There was a jury trial which resulted in a verdict in favor of the plaintiff for $15,000; on motion for a new trial the court suggested a remittitur of $3,000 which was accepted by the plaintiff, whereupon the motion for a new trial was overruled and the defendants have appealed in error to this court.

The declaration was in five counts. The first two counts allege common-law negligence, and the third and fourth counts are based upon charges of statutory negligence, and in the fifth count the plaintiff seeks a recovery of property damage for the injury to his mare and for the damage to his buggy. In all the counts the plaintiff sought both compensatory and punitive damages but on the trial the court held that this was not a proper case for the allowance of punitive damages, and that issue was not submitted to the jury. The statutory counts were also abandoned, so the case was tried on the commomlaw counts for the recovery of actual or compensatory damages.

The defendants filed pleas of not guilty.

The following facts are undisputed:

The collision occurred on West Wood Street, between Wynn and Porter Streets, in the City of Paris, at about

2:30 o'clock on the afternoon of September 7, 1942. West Wood Street is a concrete street 40 feet wide from curb to curb and had four traffic lanes marked thereon, two for eastbound and two for westbound traffic. The plaintiff was driving west in his buggy in the northern traffic lane, which was the lane next to the curb on his right. He was driving up a hill towards Porter Street. It was raining at the time and the top of the buggy was up, and the curtains were up. The defendant Eulos Jones was driving the truck of the lumber company up the hill in the same direction, following the plaintiff's buggy. He estimated the speed of the truck at about 15 miles per hour at the time of the collision. He testified that as he approached the buggy he heard a noise of some boards bouncing about in the truck and that he looked back to see if a part of his lumber was falling off, and that when he looked to the front again he was about to run into the buggy; that he attempted to turn to the left and go around the buggy but did not have time to do so, and that the truck ran into the left hind wheel of the buggy and turned the buggy over and threw the plaintiff out; that the seat and top of the buggy were torn off and that the rest of the buggy was broken up. There were no other vehicles on that part of the street at the time. The collision occurred about half way between Wynn and Porter Streets, or about 250 feet from Porter Street, which is about at the top of the hill. There was a traffic light at the intersection of Porter and West Wood Streets.

Eulos brought the truck to a stop just after he struck the buggy and went back and assisted the plaintiff into his truck and took him to the McSwain hospital; from there he went to the Lumber Company's office and reported the accident.

On the question of the plaintiff's damages there is evidence to support a finding of the following facts:

As a result of the collision the plaintiff received serious and painful injuries from which he had not recovered at the time of the trial and from which it is earnestly claimed he can never recover. The examination by Dr. McSwain showed that he had many cuts and bruises about his head, back and legs. There was a cut on his head, but the bruises about his head were more serious than the cut and showed that he had received a severe blow on the head and indicated a severe brain concussion that affected his mental sensibilities so that he might not have been able to recall his own name or remember what had happened to him. His injuries were such as would have caused very severe pain except that for a time the pain was dulled by the brain concussion. With returning consciousness the pain became very acute and sedatives were given him. There were severe contusions on the lower part of his back, near the spine and higher up about the lower part of his ribs; there were cuts and bruises on both legs, his mouth was bleeding and two of his teeth were chipped off, and one was very loose. He insisted on leaving the hospital on the same afternoon though the doctor advised him not to do so.

Dr. McSwain saw him again on the 9th of September at his home and says he was suffering very acute pain, especially in his back and legs and that "he looked about as miserable as any human I have ever seen". The worst pain was in the lower part of the back just to the left of the spine. His suffering was so great that the doctor insisted upon his returning to the hospital which he did on the following day and he remained there for five days. His suffering was very intense and it was necessary to administer powerful sedatives, and even then he

could not sleep. Over the doctor's protest he left the hospital at the end of five days because he did not feel financially able to remain longer. When he left Dr. McSwain told him "For heaven's sake to stay in bed" as it was "positively imperative" for him to do so, and he did stay in bed at home for several weeks after that. He still suffered great pain and it was necessary to give him sedatives "stronger than aspirin" for a month after he went home. The doctor kept his back and ribs strapped up while he was in the hospital and this afforded some relief.

Dr. McSwain went out to see him in November. He was then up and trying to walk but was terribly stooped, bending way over "almost like a fish hook", and unable to straighten up. The doctor urged him to try to straighten up and gave him heat treatments such as hot irons and salt and hot water bottles, and after a week or so he could stand almost erect, "but his gait gradually got worse". Dr. McSwain urged him to go to an orthopedic surgeon for treatment, and he finally went to Dr. Henry G. Hill's clinic in Memphis for treatment in January, 1943. Dr. Hill had a metal and leather brace made to support the muscles of the back and spinal column. This afforded him some relief from the pain he suffered and he was still wearing the brace up to the time of the trial.

Dr. McSwain pointed out to the jury the location of the injuries to the back, about the lower part of the ribs and lower down toward the end of the spine or the "upper part of the coccyx,—in other words, the tail bone". He testified that he could see no improvement in the plaintiff's walk or his ability to get around, and that if anything his condition in this regard was worse at the time of the trial than it was in November after the accident.

When asked whether from his observation and treatment of him he was of opinion that his injuries were permanent, his reply was that there had certainly been no improvement in his condition over a period of eighteen months up to the time of the trial and that where there was no improvement from an injury after such a length of time the injury was generally regarded as permanent.

Many lay witnesses testified as to the plaintiff's injuries and suffering, that he had been unable to sleep soundly since the accident, and that his groans while he was asleep were such as to disturb the other members of his family. He has been unable to control his legs or to walk without the use of a stick; he is terribly stooped, and when walking he pitches forward with a lurch or jerk on his left side, and has fallen several times while trying to walk. He has been unable to control his legs since the accident and the flesh is not sensitive to a pin prick or pinching.

Despite his crippled condition he has tried to get about over his farm by the use of a kind of sled, or what he calls a ground slide, pulled by his mare. His wife or a farm hand has to hitch and unhitch the mare for him. He has also been able to use a riding plow some, but he cannot get into the seat of the plow or into an automobile without assistance.

Dr. McSwain had known the plaintiff since his early boyhood. He was a strong, able bodied energetic man, and had never had any serious illness up to the time of this accident. His weight had declined from 163 pounds to 131 pounds, and at the time of the trial was 153 pounds. Dr. McSwain's personal bill was $150 and his clinic's bill was $108.45. It does not appear what Dr. Hill's bill was. It had also been necessary for the plaintiff to spend "a

considerable sum" for drugs, surgical dressings and things of that kind.

At the request of the defendant the plaintiff submitted to several examinations by Dr. W. Gardner Rhea who was introduced as a medical expert witness by the defendants. These examinations were made in July, 1943, and in March, 1944, which was just before the trial. Dr. Rhea testified that the plaintiff co-operated fully in submitting to numerous tests and examinations, one of which was the extreme test of having a very strong anaesthetic administered at intervals while he was strapped to a table.

Dr. Rhea was of opinion from his examination and the tests he made that the plaintiff had suffered very serious and painful injuries especially in the spinal region; that he was "exceedingly hypersensitive" all over his back; that pressure on the muscles and bony processes of the back caused an exaggerated reaction even with a moderate amount of pressure, and that his motion was limited to about sixty per cent. X-ray pictures were taken but Dr. Rhea could not see anything in the pictures to account for the plaintiff's disability in walking, but he said that often back injuries would not be revealed by an X-ray examination. The injury to the coccyx was noticeable and the slightest movement of the lower end of the spine caused pain. He examined the plaintiff's legs very carefully and observed that the muscles of the thighs and legs were well developed when relaxed, but when he attempted to make any voluntary movement the muscles became "extremely spastic, tight and very rigid." The plaintiff dragged his left foot more than his right in walking and the sole of his left shoe was badly worn on the outside of the sole and the toe of his right shoe was worn.

Dr. Rhea's first examination was made more than ten months after the accident. The patient co-operated fully and assisted in a thorough examination, and the doctor was satisfied ''that he did receive a very severe strain to the muscles and ligaments of his back from the neck on down to the end of the spine''. He was convinced that the plaintiff was not feigning injury, and was not a malingerer. He said: ''I do think he was injured, I still think he was injured, but whether the injury he received from being knocked out of the buggy is the total and complete cause of his walking like he does, I am unable to say. . . . I believe this accident was the beginning and was the start of the disability Mr. Harding has now'', but he was unable to account for the way he walked by an examination of the X-ray pictures or by any of the tests he made.

It was stipulated that the plaintiff was 31 years of age at the time of the accident; that he had an expectancy of life of 33.68 years; that the truck involved in the collision belonged to the defendant Lasater Lumber Company, that Eulos Jones, the driver, was regularly employed by it, and that he was using the truck to make a delivery of some doors and lumber to one of its customers at the time of the accident.

In his charge the court instructed the jury as follows: ''The court instructs you that under the undisputed proof and facts in the case, the defendants were guilty of acts of negligence in the operation of the truck, and that these acts of negligence were the proximate cause of plaintiff's injury and damage. You will therefore find in favor of the plaintiff and against the defendants in this case. The only question now submitted to you is the question of the amount of the damages''.

■ ■ There are seven assignments of error in this court which will be considered by us in their order. The first is that there is no evidence to support the verdict and that the verdict is against the law and the evidence. Enough has already been said in our statement of the facts to show that there was some evidence to support the verdict. The assignment that the verdict is against the law and the evidence is too general and will not be considered. State v. Nolan, 161 Tenn. 293, 294, 30 S. W. (2d) 601; Shuffield v. Shuffield, 6 Tenn. App. 482; La Follette v. State, 16 Tenn. App. 404, 405, 64 S. W. (2d) 857.

■ The second assignment complains of the action of the court in refusing to set aside the verdict and grant the defendants a new trial "upon the defendants' motion for a new trial, as follows", setting out at length the 16 grounds of the motion for a new trial. This is a blanket assignment and will not be considered. Several of the alleged errors complained of in the motion for a new trial are made the basis of separate assignments of error in this court, and these will be considered. The other grounds of the motion for a new trial will be regarded as having been abandoned as they are not discussed in the assignments of error, brief or arguments in this court.

The third assignment of error is based upon the action of the court in denying the defendants' motion for a mistrial upon the ground that plaintiff's attorney propounded improper questions to the witness W. H. Lasater, secretary and treasurer of the defendant Lumber Company, on the subject of liability insurance. The facts necessary to be stated in the consideration of this assignment are as follows:

This witness on his direct examination was asked:

"Q. After you found out about the accident on your return, Mr. Lasater, what did you do about the matter? A. We got in touch with the insurance people and the attorney, and turned the whole matter over to them to take care of. We contacted the doctor that waited on Mr. Harding and talked to him about it."

This was at the end of the direct examination of the witness, and the plaintiff's attorney on his cross-examination then asked him the following questions:

"Q. You say you got in touch with the insurance people? Who were they? A. The agent of the insurance company.

"Q. 2. And turned the matter over to the insurance company? A. To the attorney."

"Q. 3. Is that correct? A. Yes, sir."

Plaintiff's attorney then proceeded with the examination of the witness on another subject, whereupon defendants' attorney asked to have the jury excused so he could make a motion. The jury were excused from the court room and the defendants' attorney in their absence made a motion for a mistrial upon the ground that the plaintiff's attorney had directly questioned the witness about his insurance. After some argument on the question the court denied the defendants' motion for a mistrial, and recalled the jury to the box, and gave them the following instruction: "Gentlemen, that last question and answer by this witness about insurance is withdrawn from your consideration. The question of insurance is not an issue before you, and is not to be considered by you in any way. So, just disregard the question as to whether there is insurance or there is not insurance. That will be withdrawn from you and will not be considered by you in arriving at your verdict."

■■ It is earnestly insisted on behalf of the plaintiffs in error that the answer of the witness on his direct examination that he turned the matter over to the insurance people was a purely voluntary statement of the witness, wholly unresponsive to the question asked; and that it was error for the court to permit the plaintiff's attorney to cross-examine him on the subject, and to deny the defendants' motion for a mistrial. We can hardly agree that the answer of the witness was not responsive to the question asked; on the other hand we rather think the answer given was invited by the form of the question. The fact that the defendant Lumber Company had insurance having been brought to the attention of the jury, was it reversible error for the court to deny the defendants' motion for a mistrial because of the plaintiff's attorney's cross-examination of the witness? In this connection it is to be borne in mind that there was no objection to the cross-examination, and that no new fact was developed by it. In view of the fact that the subject was first introduced by defendants' counsel on the direct examination of the witness, we do not think the subsequent reference to it by plaintiff's counsel on his cross-examination could have occasioned any serious injury to the defendants, and such damage as may have been done was cured by the prompt action of the trial judge in directing the jury to disregard the evidence entirely. See annotations on the subject in 56 A. L. R. 1451; 74 A. L. R. 858; 95 A. L. R. 399; and 105 A. L. R. 1327. To reverse the judgment upon this ground would be in effect to assume that the jury disregarded the poitive instructions of the court and based their verdict in part, at least, upon evidence which they had been instructed not to consider. As said in Central Coal & Coke Co. v. Orwig, 150 Ark. 635, 235 S. W. 390, 394, "to so hold [that the

error in regard to the attempt to show that the defendant is insured cannot be cured by instructions to the jury] would impeach the jury of a desire or willingness to give heed to the remarks of interested counsel, rather than to follow the instructions of the impartial judge, and this too notwithstanding their oath to decide the case according to the instructions of the court and the evidence adduced by the witnesses.''

The tendency of the courts is towards a more liberal rule in refusing reversals upon the ground that it appears from the evidence that the defendant carries indemnity insurance in such cases, especially where it appears that no improper practice has been resorted to to inject the subject into the record. And this is as it should be, in view of the fact that the custom of automobile owners in carrying liability insurance against loss or damage has become so general that jurors must be assumed to be cognizant of the fact. Bourne v. Barlar, 17 Tenn. App. 375, 67 S. W. (2d) 751; Antel v. Poli, 100 Conn. 64, 123 A. 272; Morris v. Montgomery, 229 Mich. 509, 201 N. W. 496; Carter-Mullaly Transfer Co. v. Bustos, Tex. Civ. App., 187 S. W. 396.

In Bourne v. Barlar, supra, 17 Tenn. App. at page 379, 67 S. W. (2d) at page 753, it is said: ''We think all these statements about insurance were improper, but did they or were they liable to affect the verdict? We think not. In this enlightened age it is common knowledge, and everybody knows, that almost every owner of an automobile carries liability insurance, hence everybody knows how it is obtained and the manner of protection. Each juror knows that it is unjust and wrong to award a verdict against a defendant simply because he may have insurance and when he does so he stultifies himself and is unworthy to sit as a juror.''

In Ingolsby v. Burnett, 163 Tenn. 173, 175, 40 S. W. (2d) 1013, 1014, the plaintiff's attorney asked the plaintiff the following question: State if the attorneys representing the company, the insurance company, asked you to go to their doctor, Dr. Rogers?'' Defendant's objection to the question was sustained and the jury were instructed to disregard it. Defendant thereupon asked the court to discharge the jury and grant a new trial. The court denied the application and this action was assigned as error. This court affirmed the judgment, and a petition for a writ of certiorari was denied by the Supreme Court in an opinion by Justice McKinney. In the opinion the court adopts the rule laid down by the annotator in the note in 56 A. L. R. at pages 1509-1511, as follows: ''In accord, however, with the better view, the majority of the courts hold that prompt exclusion of questions designed to elicit testimony with regard to insurance carried by the defendant, coupled with instructions to the jury to disregard the improper matter, sufficiently protects the defendant's rights, without requiring the judgment rendered to be reversed, especially if it can be said as a fact that the verdict was not affected thereby, and the plaintiff does not persist in attempting to get the objectionable matter before the jury, and thus override the ruling of the court against him.''

The same conclusion was reached by this court in Marion Construction Company v. Steepleton, 14 Tenn. App. 127, 148. In that case the plaintiffs' attorney asked the witness, ''You have carried insurance with your Company all that time?'' The question was objected to and the objection was sustained, and the court instructed the jury not to consider it at all, that it would not be material whether he carried insurance or didn't, and that it was highly improper to prove whether or not anybody carried

insurance or didn't carry it. Defendants' counsel asked that the jury be excused, and in their absence moved for a mistrial, which motion was denied. Error was assigned here upon this ruling, and Judge Faw, in the opinion of this court, said: "The record reveals no excuse for the act of plaintiff's attorney in asking the improper question challenged by the defendant's seventh assignment of error, supra; but the question here is whether it constitutes reversible error."

In ruling that it did not, because the question was not answered and because the jury were admonished not to consider it at all, he quotes the following from the annotation in 56 A. L. R. 1548: "Insurance against loss or damage from accident or negligent conduct is so universal that jurors, as well as courts, must be assumed to be cognizant of this fact, and hence the evidence thereof will not be as likely to create prejudice as it might have been before this method of business became so universal."

Again, the question was before the court in the case of Potts v. Leigh, 15 Tenn. App. 1, 5. In that case a witness for the plaintiff in answer to the question whether he had seen Mr. Potts at the scene of the accident stated that he had seen him there, and in the course of his answer said, "and he also called his insurance company." The defendant at once asked to have the jury excused and in their absence made a motion for a mistrial, which was overruled, and this was made the basis of an assignment in this court. The court in an opinion by Judge DeWitt said:

"Certainly where the plaintiff or his counsel deliberately seek to introduce such evidence or persist in it, and it is brought before the jury, the error is reversible. Manufacturing Co. v. Woodall, 115 Tenn. 605, 90 S. W.

623; [South Memphis] Brick Co. v. Dotson, 8 Higgins, 218, [8 Tenn. Civ. App. 218] . . .

"But where a reference to liability insurance was voluntarily made by a witness in ignorance of the error it has not been regarded as sufficiently serious to warrant a reversal" (citing Harbin v. Elam, 1 Tenn. App. 496).

The assignment of error was accordingly overruled.

We do not think a reversal of the judgment is warranted in the instant case (1) because we think the answer of the witness Lasater that he turned the matter over to the insurance company was responsive to the question asked by the defendants' counsel as to what he did when he learned about the accident; (2) because no new fact was developed by the cross-examination; (3) because there was no objection to the questions asked on the cross-examination; and (4) because there is no assignment of error that the verdict as reduced by the remittitur was excessive. The third assignment of error is accordingly overruled.

■ By their fourth assignment of error the plaintiffs assert that the giving of the instruction to the jury that under the undisputed proof the defendants were guilty of negligence in the operation of the truck which was the proximate cause of the plaintiff's injury was a most grievous error committed against them, because, to use their language, "there is a very definite dispute as to how much and what part of the alleged disability (of the plaintiff) was caused by the accident."

This argument goes to the amount of the damages which the plaintiff was entitled to recover, which question was submitted to the jury, and does not negative the idea that the defendants were guilty of some actionable negligence. It is not claimed that the plaintiff was not injured or that the driver was not at fault. The mere fact

that the collision occurred in the way that Eulos Jones testified it did is ample evidence of his negligence in the operation of the truck and warranted the giving of the instruction; and there was no conflict in the evidence on this point. The fourth assignment of error will therefore be overruled.

By their fifth assignment of error the plaintiffs in error complain that they were denied their constitutional right to a jury trial by the instruction that the defendants were guilty of negligence which was the proximate cause of the collision. And it is said that after having given the jury the instruction that they were the sole and exclusive judges of the facts and circumstances, the credibility of the witnesses and the weight to be given their testimony, the court then proceeded to deny the defendants their constitutional right to have the jury pass upon "the facts and circumstances" by his instruction that the only question submitted to them was the question of the amount of the damages.

It is now so well settled as not to require the citation of authority to support the proposition that it is not a denial of the constitutional right to a jury trial for the trial judge to direct a verdict when there is no legal doubt as to the conclusion to be drawn from the whole evidence upon the issues to be tried. This is just what the trial judge did in the instant case when he instructed the jury that under the undisputed facts the defendants were guilty of negligence in the operation of the truck and that their negligence was the proximate cause of the plaintiff's injuries. It would have been an invasion of the province of the jury for him to have gone further and determined the amount of the damages because under the evidence minds of reasonable men might well differ as to the extent of the plaintiff's injuries and the amount

to be awarded as compensation for his injuries. This was essentially a jury question and the court very properly submitted it to the jury under a proper charge as to the measure of damages and the preponderance of the evidence. It was in connection with his charge on these questions that the court stated to the jury that they were the sole and exclusive judges of the facts and circumstances, the credibility of the witnesses and the weight to be given to their testimony, etc. We find no error in the action of the court in this regard and this assignment of error is overruled.

The sixth assignment of error complains of the refusal of the court to give the following special instruction requested by the defendants: "I further charge you, Gentlemen of the jury, that there is no conflict in the medical testimony of the doctors who were witnesses in this case to the effect that they cannot ascribe a cause for the past and present disability to the lower limbs of the patient, and the court cannot therefore permit a jury of laymen to speculate when professional men have so testified. Therefore should you find for the plaintiff, you must not take into consideration the disabilities of the plaintiff for which the doctors can ascribe no cause."

 This special instruction was properly refused because of the recital that neither of the doctors could ascribe any cause for the past and present disability in the lower limbs of the plaintiff. As we interpret their testimony both of the doctors were of opinion that the plaintiff's injuries and his disability were directly attributable to the accident. This instruction certainly excludes from the consideration by the jury of the abundant medical testimony tending to show that the plaintiff sustained very serious and painful injuries which were directly attributable to the accident, and neither of the

doctors pretends to assign any other cause for the disability in the plaintiff's legs. All of the testimony is that he was a strong, active and able-bodied man up to the time of the accident and that he had been a hopeless cripple ever since.

It was not error to refuse to give the instruction in the form requested, and this assignment of error is overruled.

The seventh assignment of error is based upon the refusal of the court to strike from the record the testimony of the plaintiff, to the effect that he had been rendered impotent as one of the results of the accident. At the close of the plaintiff's proof he was recalled as a witness and testified as follows:

"Q. 6. Now, Mr. Harding, I will ask you whether or not you have suffered any other physical disability since the occurrence of this injury which you did not detail on the stand on yesterday? A. Well, I don't have any passion—any manhood.

"Q. 7. You mean you haven't had that function since the occurrence of this accident? A. Yes, sir.

"Q. 8. You are incapable of it? A. Yes, sir."

At this point the attorney for the defendants moved that this testimony of the witness be stricken from the record on the ground that this was a matter that the witness could not testify to,—that it was purely his theory of the matter, as to whether his powers to procreate were destroyed, or just proscribed. The motion was overruled and the defendants excepted.

 We think this testimony was incompetent and should have been excluded, not upon the ground assigned by the counsel at the time but upon the ground that it was evidence of a special damage that was not alleged in the declaration. While the declaration alleges at length and in detail the damages, general and special, which the

plaintiff had sustained as the result of the collision, there is no specific allegation of impotency, or any general allegation which might be said to embrace within its terms the condition of impotency.

The applicable rule in such cases is stated by Mr. Greenleaf (vol. 2, sec. 254), in the following language: "Where damages, though the natural consequences of the act complained of, are not the necessary results of it, they are termed special damages which the law does not imply; and therefore, in order to prevent a surprise upon the defendant, they must be particularly specified in the declaration, or the plaintiff will not be permitted to give evidence of them on the trial; but where the special damages are natural consequences of the wrongful act, the jury may infer it from the wrongful act."

This statement of the rule has been adopted by our court in Stallcup v. Bradley, 43 Tenn. 407, 412; and Burson v. Cox, 65 Tenn. 360. See to same effect Grace v. Curley, 3 Tenn. App. 1, 8; 25 C. J. S., Damages, sec. 131, pp. 752-754; 15 Am. Jur., Damages, secs. 311-313. In the text last cited it is said in section 313 that "Impotency cannot be relied on as an element of damages where the petition neither alleges such injury nor contains an allegation of a general nature embracing it within its terms. But it need not be specially pleaded where it is a natural and direct result of the injury alleged." See also Hall v. Manufacturers' Coal & Coke Co., 260 Mo. 351, 168 S. W. 927, 933, Ann. Cas. 1916C, 375.

The question arose in the case of Illinois Central R. R. v. Solinsky, 12 Tenn. App. 389, 406, where the plaintiff testified that as the result of the nervous shock and concussion of the brain that he had sustained he became impotent, and the defendant's counsel asked to have the testimony excluded upon the ground that it related to a

special damage that was not alleged in the declaration. The plaintiff then asked leave to amend his declaration so as to allege it and the court permitted the amendment to be made. No exception was taken to this action of the court.

But we do not think a reversal should be granted for the error in the wrongful admission of this testimony (1) because upon a remand the declaration could be amended so as to allege this element of special damages and thus render the testimony competent on a new trial; and (2) because there is no assignment of error that the verdict as reduced by the remittitur is excessive, and we think that any damages done the defendants by the introduction of the incompetent testimony was cured by the remittitur.

Upon a careful review of the testimony we feel satisfied that the verdict as thus reduced is not excessive. The seventh assignment of error will therefore be overruled.

All the assignments of error having been overruled it results that the judgment of the Circuit Court will be in all respects affirmed at the cost of the plaintiffs in error and their sureties on the appeal bond.

Anderson, P. J., and Baptist, J., concur.