FILED
03/30/2026
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 17, 2025 Session

## LEIGHTON H. LIPPERT ET AL. v. B&D REAL ESTATE PROPERTIES, LLC

**Appeal from the Circuit Court for Bradley County**
**No. V-20-146          Judge J. Michael Sharp**

_____

**No. E2024-01676-COA-R3-CV**

_____

A developer failed to use proper erosion control measures, resulting in recurring sediment runoff into a pond owned by neighboring landowners and increasing accumulation of sediment therein. The trial court concluded that developer's actions constituted a temporary, not permanent, nuisance and awarded injunctive relief and damages. Damages for emotional distress were included among the damages the trial court awarded. The developer appeals, challenging the trial court's finding as to proximate causation and asserting that its actions, if a nuisance, were a permanent and not temporary nuisance, and accordingly the landowners' suit was barred by the statute of limitations. The developer also asserts that the trial court erred as to the remedies awarded, challenging both the injunctive relief and emotional distress damages. We affirm the trial court's findings as to proximate causation and its conclusion that the nuisance is temporary. We also affirm the trial court's imposition of an injunction. However, we reverse the award of damages for emotional distress based upon deficient pleading.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court for Bradley County Affirmed in Part; Reversed in Part**

JEFFREY USMAN, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, P.J., E.S., and MICHAEL SWINEY, J., joined.

Ellis A. Sharp and Annie S. Duncan, Knoxville, Tennessee, for the appellant, B&D Real Estate Properties, LLC.

H. Franklin Chancey, Cleveland, Tennessee, for the appellees, Leighton H. Lippert and Richard D. Lippert, Sr.

## OPINION

I.

This appeal arises from a dispute between neighboring property owners regarding improper and insufficient erosion control methods used in a development project, resulting in recurrent sediment runoff as well as accumulation of sediment in a nearby private pond. Appellees Leighton H. Lippert and Richard D. Lippert, Sr. (the Lipperts) own residential real property located in McDonald, Tennessee. The property includes a 0.8-acre pond, which the Lipperts described as "perfect" prior to the events at issue. Appellant B&D Real Estate Properties, LLC, (B&D) is the developer of a subdivision that is located at a higher elevation and is across from the Lipperts' property.

In developing the subdivision, B&D subdivided the property into residential lots and performed grading and excavation work. The Lipperts alleged that, because of improper control of runoff in connection with B&D's development of the subdivision, significant amounts of dirt, silt, and earth washed from B&D's property into a natural stream that feeds the Lipperts' pond. They asserted that, following rainfall events, muddy, brown water from the development flowed into their pond.

The problems with the runoff began shortly after development commenced on B&D's property. Mr. Lippert filed his first complaint with the Tennessee Department of Environment and Conservation (TDEC) in December 2016. In response, B&D took effective remedial measures in 2016 and 2017 regarding road stabilization and pipe repairs that temporarily resolved the runoff issues to the Lipperts' satisfaction. However, as the development project progressed, this initial success and responsiveness did not continue. Consequently, in March 2020, the Lipperts filed a complaint in the Circuit Court for Bradley County. They advanced a nuisance claim against B&D.

During the pendency of the litigation, TDEC issued multiple notices of violation to B&D regarding sediment control failures. In January 2021, March 2022, and June 2022, TDEC cited B&D for allowing sediment-laden water to leave its development site and for inadequate Erosion Prevention and Sediment Control (EPSC) measures. The TDEC reports documented specific failures in erosion control measures, including cracked pipes and a lack of maintenance. One TDEC inspection report noted: "Sediment laden water is being discharged, by-passing EPSC measures. Color contrast in receiving waters downhill from outfall point."

A bench trial was conducted on February 14, 2024, and April 2, 2024. The trial judge also conducted a site visit to the properties to observe the condition of the pond and the surrounding terrain. At trial, the court heard testimony from Leighton Lippert, who testified that he treated the pond with chemical flocculants and installed riprap rock in an attempt to mitigate the damage. Mr. Lippert described the stress of his "pristine" pond turning into a "muddy eyesore." He testified that he had contacted government officials over 300 times in order to try to save his pond. The Lipperts introduced a Solitude Lake

- 2 -

Management report estimating the pond contained 1,091 cubic yards of sediment. The deepest accumulation was on the south side of the pond, away from the development; however, there was substantial buildup at the point of the pond nearest the development. During the trial, Mr. James Brown, who prepared the report, testified regarding the remediation, estimating that the cost of removal of sediment for the pond could range from $50,000 to "a couple hundred thousand dollars."

B&D presented the testimony of Alan Ogle, a civil engineer and private consultant hired by B&D to perform erosion analysis and inspections. Mr. Ogle admitted that turbidity in the Lipperts' pond was caused, at least partially, by runoff from B&D's development. He also noted that "the discoloration following a rain entering Mr. Lippert's pond was primarily coming from runoff from this development." He acknowledged that during his inspections, he observed deficiencies in B&D's erosion controls, such as unstabilized dirt piles and silt fences needing maintenance. Mr. Ogle identified specific, reasonable measures B&D could take to mitigate or eliminate the sediment runoff, including modifying the existing sediment basin, installing baffles to reduce sediment discharge, installing a retention basin below the sediment pond, and utilizing flocculants. While acknowledging that runoff from the development caused the discoloration, Mr. Ogle contended that leaf debris from surrounding hillsides was another major contributor to the sediment accumulation.

In August 2024, the trial court entered an order finding that B&D created a temporary nuisance due to ineffective EPSC measures resulting in the accumulation of sediment in the Lipperts' pond. The court found that the nuisance was "created by the defendant . . . due to the defendant's negligent operation . . . on their property." The court determined that the nuisance was a temporary rather than a permanent nuisance, which was a matter of consequence in terms of whether the Lipperts had filed within the statute of limitations. As to abating the nuisance, the trial court required B&D to "take erosion control measures on its property that should be outlined by the defendant's expert, and approved by the appropriate governmental agency." The trial court specifically noted failures regarding B&D's sediment control basin. In accordance therewith, the trial court required employment of

> an appropriate engineer to perform the necessary studies, and ultimately to make the necessary design to address the impact not only of the existing drainage but needed drainage in the future. This should include what impact, if any, future development will have on the existing watershed affecting the plaintiffs' pond. The defendant shall implement the recommendations of the appropriate engineer's study and/or governmental requirements.

Finding that the Lipperts had suffered emotional distress, the trial court also awarded "$20,000 for their ongoing emotional distress over a very extended period of time." The trial court also awarded Mr. Lippert approximately $5,000 for his expenses in attempting

to control sediment runoff into the pond, such as riprap rock and silt fencing. The trial court directed Mr. Lippert to provide a sworn affidavit detailing his exact costs within 14 days of issuance of the court's order. As to remediating the damage done by the sediment that had already flowed into the Lipperts' pond and damages in connection therewith, the trial court indicated that the evidence showed sediment buildup in two areas of the Lipperts' pond. The trial court found B&D liable as to only one of those areas, "the northernmost end of the pond, as shown on the trial exhibit #25." The trial court's order provided for removing this sediment at B&D's cost. The trial court indicated that it was unpersuaded, however, by the testimony as to the extent of diminution in value of the property. Accordingly, the trial court provided for the parties either agreeing upon a licensed appraiser or presenting dueling appraisals as to the pre-damaged versus post-damaged value of the Lipperts' property. Finally, the trial court ordered the Lipperts' attorneys' fees be paid by B&D. With regard to the attorney's fees, the trial court directed filing of a sworn affidavit with 14 days of issuance of the order.

The Lipperts filed *Plaintiffs' Statement of Damages*, an *Affidavit of Attorney's Fees*, and a *Notice of Filing of Plaintiffs' Appraisals. Plaintiffs' Statement of Damages* provided information as to the Lipperts' expenditures for trying to address the runoff onto their property and detailed estimates for remediation of the pond from service providers. The *Affidavit of Attorney's Fees* set forth a list of the hours, services, and charges in connection with legal representation for the Lipperts in these proceedings. Responding to the trial court's order in connection with diminution of value, the Lipperts filed a *Notice of Filing of Plaintiffs' Appraisal* which included property valuation appraisals from E. Wells Blake, Jr.

B&D filed a *Motion to Alter or Amend Judgment* pursuant to Tenn. R. Civ. P. 59.04. Therein, B&D challenged almost every aspect of the trial court's initial order. B&D argued that emotional distress had not been properly pled and, accordingly, an award for emotional distress to the Lipperts was improper. B&D also argued that there was no basis in law for awarding attorney's fees to the Lipperts. Regarding the trial court's finding that the nuisance was a temporary nuisance, B&D insisted that the nuisance was permanent, not temporary, and, therefore, the Lipperts' complaint was filed outside the statute of limitations. As to the trial court's ruling allowing for appraisals to establish the extent of the diminution in value of the Lipperts' property, B&D argued that diminution in value was not a proper basis for a damage award and that consideration of the appraisals would constitute an improper opening of the evidence after trial. B&D also filed what it termed *Defendant's Response to Plaintiffs' Belated Submission of Damages and Attorney Fees*. Therein, B&D filed a response opposing the Lipperts' *Plaintiffs' Statement of Damages* and *Affidavit of Attorney's Fees*, but it did not move to strike these submissions.

In October 2024, the trial court entered an order granting B&D's motion to alter or amend in part but otherwise denying the motion. The trial court reaffirmed its central determination that the nuisance was temporary and not permanent. The trial court concluded, however, that B&D was correct that there was neither a statutory nor contractual basis for its award of attorney's fees in this case. The trial court amended its order to eliminate the attorney's fees award. The trial court also amended its order "with regard to the portion of the Court's order wherein the Court allowed the proof to be re-opened presenting an appraisal to show any diminution in value that may exist." Addressing the damages award for diminution of value of the Lipperts' property, the trial court concluded that B&D was correct that it should not have allowed for the appraisals because this "could be construed as reopening the proof." As to remediation of the sediment built up in the pond as a result of B&D's nuisance activities, the trial court expressly stated that "its reasoning ordering the sediment to be removed by the defendant, as set out in the Court's order, is the appropriate remedy."

B&D subsequently filed *Defendant's Objection to Appraisals of Real Property Submitted by Plaintiffs and Motion to Strike Same* and *Supplement to Defendant's Objection to Appraisals of Real Property Submitted by Plaintiffs and Motion to Strike Same*. Therein, B&D moved the court "to strike Plaintiffs' submitted Appraisals of Real Property ('Appraisals') done by E. Wells Blake, Jr." The record does not contain a comparable motion to strike *Plaintiffs' Statement of Damages*. In a November 2024 order, the trial court noted that the motion to strike the appraisals was in accordance with its prior decision regarding the diminution in value award. The trial court, accordingly, struck the appraisals from the appraiser E. Wells Blake, Jr.

B&D timely appealed. B&D set forth its issues on appeal as follows:

I.      Whether the trial court erred in finding that the Plaintiffs sufficiently proved that the Defendant proximately caused the accumulation of sediment in the Plaintiffs' Pond by way of water runoff in order to recover for nuisance.

II.    Assuming the Plaintiffs could prove that the Defendant was the proximate cause of the sediment, whether the Plaintiffs established that the runoff was a temporary nuisance when no proof was presented to establish the amount of labor and/or money required to remedy the alleged nuisance.

III.   Assuming the Plaintiffs could prove that the Defendant was the proximate cause of the sediment, whether there was sufficient proof to support the damages (i.e. to clean the Pond) awarded to the Plaintiffs by the trial court for a temporary nuisance.

IV.     Assuming the Plaintiffs could prove that the Defendant was the proximate cause of the sediment, whether the trial court erred in awarding damages for emotional distress.

V.      Assuming the Plaintiffs could prove that the Defendant was the proximate cause of the sediment, whether the trial court erred in finding that the nuisance was temporary rather than permanent.

VI.     If preponderance of the evidence in this case establishes that the nuisance in this case is permanent rather than temporary, whether the Plaintiffs' claims are barred by the 3-year statute of limitations found at Tenn. Code Ann. § 28-3-105.

The Lipperts responded by arguing in support of the trial court's conclusions in connection with each challenge raised by B&D.

## II.

Tennessee appellate courts review a "trial court's findings of fact following a bench trial de novo upon the record with a presumption of correctness, 'unless the preponderance of the evidence is otherwise.'" *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017) (quoting Tenn. R. App. P. 13(d)). Review as to a trial court's determination on questions of law is "de novo with no presumption of correctness accorded to the rulings of the courts below." *McNabb v. Harrison*, 710 S.W.3d 653, 658 (Tenn. 2025).

## III.

B&D argues the trial court erred in finding that the Lipperts proved proximate causation. In general, proximate causation is a question of fact. *King v. Anderson Cnty.*, 419 S.W.3d 232, 245 (Tenn. 2013). B&D contends that proximate cause requires a showing that its conduct was a substantial factor in causing the Lipperts' injury and that such a showing in a case like this one must be through expert testimony. B&D asserts, based on this court's decision in *Ray v. Neff* that "expert testimony is required in instances where knowledge regarding things like waterflow patterns, waterflow effects, and waterflow modifications are at issue because these matters are not possessed by those with ordinary knowledge." *See Ray v. Neff*, No. M2016-02217-COA-R3-CV, 2018 WL 3493158, at *10 (Tenn. Ct. App. July 20, 2018).

However, *Ray* is distinguishable from the present matter on two bases. One, in *Ray,* the court was faced with determining whether and to what extent damage was caused by a specific pipe installed by the defendant as opposed to work done by a third party with whom the plaintiff had already settled. *Id.* The court explained that expert proof on this issue was needed because "[t]he analysis required to separate the effects resulting solely from the pipe from the effects that also resulted from the work done by [the third party] is

. . . simply not within 'ordinary knowledge, common sense, and practical experience.'" *Id.* Here, there is no similar question as to apportioning damage between work done by two separate parties.

Two, assuming for purposes of argument that expert proof is necessary in the present case, in contrast to *Ray*, the record here contains such evidence. The record contains evidence from B&D's own expert, Mr. Ogle, who explicitly admitted that the caramel color or turbidity of the pond was primarily caused by runoff from the development. Additionally, Mr. Ogle testified that water leaving the sediment basin on B&D's property traveled along a dirt channel and joined an existing wet-weather spring before entering the Lipperts' pond. Assuming expert testimony was required, where the defendant's own expert established the necessary causal link, the Lipperts were not required to present cumulative expert testimony.

Furthermore, the expert testimony was supported by additional documentary evidence. The trial court considered the TDEC reports, which documented failures in EPSC measures. These documents provided factual support for the conclusion that sediment escaped the containment measures and flowed into the pond through B&D's failure to exercise appropriate erosion control measures.

To support its argument that the evidence preponderates against the trial court's finding that the development was the legal cause of the sediment accumulation and discoloration in the Lipperts' pond, B&D relies on Mr. Ogle's statements that it is impossible to distinguish between sediment originating from the development and sediment resulting from natural sources, such as leaves and hillside runoff. B&D specifically points to Mr. Ogle's testimony that the "leaf debris in the pond" was "the number one offender" in terms of sediment accumulation. However, despite his testimony regarding the difficulty in distinguishing natural debris from that caused by the runoff, Mr. Ogle conceded on cross-examination that erosion from the development caused more material to reach the pond than would have occurred naturally. The trial court properly exercised its role as the trier of fact in distinguishing between the volume of natural debris and the sediment from B&D's development. *See F.A.B. v. D.L.B.*, No. M2012-01100-COA-R3CV, 2013 WL 5872284, at *15 (Tenn. Ct. App. Oct. 29, 2013) (noting that, even in a bench trial, "[t]he weight and credibility accorded to expert testimony is also entrusted to the trier of fact"). Indeed, despite most of the sediment build-up being in the center of the pond, the trial court's order only required B&D to remove the sediment "at the points nearest the point of discharge where the waters run into the plaintiffs' pond." The trial court's order is reflective of the expert testimony in the case, and in accordance therewith the order does not require removal of the sediment at the center of the pond, which was not shown to have been caused by B&D's failure to properly control erosion from its development.

Again, assuming for purposes of argument that expert testimony is required to establish proximate cause under the circumstances of this case, such evidence appears in the record. From our review of the record, we cannot say that the evidence preponderates against the trial court's finding that B&D's actions were the proximate cause of the nuisance.

IV.

B&D argues that the trial court erred in classifying its conduct as a temporary nuisance rather than a permanent nuisance. The distinction is of significance, according to B&D, because the alleged nuisance began as early as December 2016 and because the Lipperts did not file their Complaint until March 2020. Therefore, if its activities constituted a permanent nuisance rather than temporary nuisance, then, according to B&D, the Lipperts' claims are barred by the three-year statute of limitations. *See* Tenn. Code Ann. § 28-3-105. In support of its contention that the nuisance is permanent, B&D contends that the Lipperts had the burden to establish the nuisance was temporary and failed to do so because they did not present specific evidence of the reasonable labor and money required to abate the nuisance.

Tennessee law distinguishes between temporary and permanent nuisances for purposes of damages and the statute of limitations. The determination of whether a nuisance is a temporary or permanent nuisance presents a question of fact. *Anderson v. Am. Limestone Co.*, 168 S.W.3d 757, 761 (Tenn. Ct. App. 2004) (quoting *Caldwell v. Knox Concrete Products Inc.*, 391 S.W.2d 5, 11 (1964); *see also Ray*, 2018 WL 3493158, at *5. "Whether a claim is barred by an applicable statute of limitations is a question of law." *Brown v. Erachem Comilog*, *Inc.*, 231 S.W.3d 918, 921 (Tenn. 2007).

A temporary nuisance is one that "can be corrected by the expenditure of labor or money." *Clabo v. Great Am. Resorts, Inc.*, 121 S.W.3d 668, 671 (Tenn. Ct. App. 2003). It is recurrent in nature, and damages may be recovered from time to time until the nuisance is abated. *Id.* Conversely, "[a] permanent nuisance is one that is 'presumed to continue indefinitely, and is at once productive of all the damage which can ever result from it.'" *Id.* In such cases, the injury is fixed, and the statute of limitations begins to run upon the creation of the nuisance. *Anderson*, 168 S.W.3d at 761. This court has previously noted that "neither definition of nuisance is entirely satisfactory because 'nearly every nuisance could be abated by the devotion of enough time and money to it.'" *Clabo*, 121 S.W.3d at 671. Accordingly:

> It is helpful to look . . . at "whether the harm resulted from reasonable and lawful operations on the defendant's property . . . (as opposed to negligent) and still interfered with the use and enjoyment of the plaintiff's property." If the damages resulting from the nuisance are due to the fact that the defendant is "negligently operating its property so as to unnecessarily create the

damage'" and it is within the defendant's power to operate in a non-negligent manner, then the nuisance is temporary.

*Id.* at 671-72 (internal citations omitted).  Alternatively, when "the operation is done with due care considering the use thereof, and it is not contemplated that any change in operation will be made, the damage is *permanent*." *Id*. at 672.

We find B&D's argument unavailing.  The Lipperts presented evidence that the nuisance is recurrent.  The sediment intrusion occurs sporadically during rainfall events when B&D's insufficient containment measures fail.  The record reflects that B&D successfully abated similar failures in the past.  The Lipperts identified distinct failures in 2016, involving road stabilization, and in 2017, involving a cracked pipe, where B&D expended money and labor to effectively correct the issues.  Nevertheless, B&D suggests the statute of limitations clock should have started to run at this point.  This history of successful remediation, however, directly refutes B&D's contention that abatement is impossible and supports the finding that the current failures are similarly correctable.  This court has held that "[a] temporary nuisance is one that 'can be corrected by the expenditure of labor or money' and the damages to the property 'are recurrent and may be recovered from time to time until the nuisance is abated.'" *Whitford v. Village Groomer & Animal Inn, Inc.*, No. M2020-00946-COA-R3-CV, 2021 WL 4240989, at *3 (Tenn. Ct. App. Sept. 17, 2021) (quoting *Pate v. City of Martin*, 614 S.W.2d 46, 48 (Tenn. 1981)).  The recurrent nature of the runoff in this case, alongside the finding of negligence, supports the trial court's finding that this nuisance is temporary.

Contrary to B&D's assertion that the Lipperts failed to prove the nuisance could be abated, the record contains substantial evidence, supplied largely by B&D's own expert, that the condition is correctable.  The trial court credited the testimony of Mr. Ogle, B&D's civil engineer, who identified specific measures to mitigate or eliminate the sediment runoff.  These measures included modifying the existing sediment basin, installing baffles to reduce sediment discharge, installing a retention basin below the sediment pond, and utilizing flocculants.

B&D argues, however, that Mr. Ogle also testified that the total elimination of runoff was "impossible" without a prohibitively large containment area.  This argument misses the mark.  The nuisance complained of is not the natural flow of water, but the sediment-laden runoff resulting from B&D's inadequate EPSC measures.  The record shows that TDEC repeatedly ordered B&D to repair silt fences and maintain basins, measures that B&D's own records show were feasible but occasionally neglected.  Indeed, the record shows that in 2016 and 2017, B&D successfully mitigated the runoff to the Lipperts' satisfaction.  The trial court noted that while Mr. Ogle claimed complete containment was difficult, his own reports and TDEC correspondence repeatedly identified "corrective actions" that B&D needed to take to bring the site into compliance.  The very existence of these regulatory requirements such as repairing silt fences, stabilizing soil

- 9 -

piles, and maintaining sediment basins, runs contrary to the assertion that the runoff condition is permanent and irremediable. B&D offers no explanation of how to square TDEC's repeated orders to "immediately repair and/or install effective EPSC measures" with the notion that the problem is uncorrectable.

B&D relies heavily on the argument that the Lipperts failed to present a specific dollar figure to prove the "reasonableness" of the abatement. This argument is unpersuasive. The "expenditure of labor and money" standard does not require a plaintiff to proffer an engineering budget or a contractor's bid to survive a statute of limitations defense; it merely requires a showing that the nature of the nuisance is such that it can be corrected. *See Pate*, 614 S.W.2d at 48. The dispositive inquiry is not the precision of a restoration quote, but whether the defendant is "negligently operating its property" and whether it is "within the defendant's power to operate in a non-negligent manner." *Clabo*, 121 S.W.3d at 671-72. Here, the record, including photos of failed EPSC measures, demonstrates that the "labor and money" required involve routine construction maintenance: repairing silt fences, seeding soil, and cleaning sediment basins. The record demonstrates that these expenditures relate to routine site maintenance, not "unlimited" expenditures. *Id.* at 672. Indeed, the trial court found that "the defendant has, and has had, the ability to operate their property and/or to conduct themselves on their property in a nonnegligent manner, but have failed to do so." As discussed *infra,* the measures ordered by the trial court to remediate the runoff included those recommended by Mr. Ogle.

In this context, it is important to distinguish the accumulated sediment from the nuisance itself. The recurrent runoff resulting from negligent operation of B&D's development constitutes the abatable nuisance, while the sediment buildup is physical damage resulting from that nuisance. *See id.* (noting the remediation of the resulting damages is distinct from the abatement of the ongoing nuisance). B&D's arguments with regard to abating the nuisance seemingly conflate the two, implying that because there is already sediment in the pond that the condition is necessarily permanent. However, the trial court found B&D's operations continue negligently to produce ongoing runoff that continues to improperly result in new sediment ending up in the Lipperts' pond. The trial court imposed injunctive relief requiring abatement of this ongoing nuisance activity.

From our review of the record, the evidence in this case does not preponderate against the trial court's conclusion that the nuisance in this case is temporary rather than permanent.

## V.

B&D also asserts that the trial court erred as to the remedies it provided in this case. It challenges the injunctive relief imposed by the trial court both with regard to its requirement of proper erosion control and its requirement that B&D remove the sediment built up at the northernmost point of the pond nearest to the development. B&D also

challenges the award of emotional distress damages, asserting such damages were not adequately raised in the pleadings.

## A. Injunction to Stop Runoff and Remove Sediment

The trial court ordered B&D to "stop allowing sediment to run[ ]off of their property and into the plaintiffs' lake" and to implement specific erosion control measures. B&D argues this mandate is unsupported by the evidence and essentially mandates an engineering impossibility. B&D relies on testimony from its expert, Mr. Ogle, that completely eliminating runoff would require an "impossibly large containment area."

We find no error in the trial court's decision to grant injunctive relief requiring proper erosion control. Tennessee law provides that a plaintiff subjected to a nuisance may be entitled to injunctive relief, particularly where the nuisance is likely to continue. *See Pate*, 614 S.W.2d at 48. The record supports the trial court's finding that the sediment runoff is a recurrent condition resulting from ineffective erosion control measures, rather than an unalterable permanent condition.

In asserting that stopping all water runoff is impossible, B&D misinterprets the extent of the trial court's mandate. The order does not require the impossible task of stopping all water runoff; rather, it requires B&D to stop the flow of sediment resulting from negligent erosion control practices in developing the property. An injunction requiring a developer to contain its own construction debris does not demand the impossible; it merely demands compliance with the standard of care and state regulations. The trial court credited Mr. Ogle's own testimony identifying feasible corrective actions, such as modifying the sediment basin, installing baffles, and using flocculants. Furthermore, the repeated notices of violation from TDEC are consistent with an understanding that B&D's failures are capable of remedy, not inevitable consequences of non-negligent development.

The trial court found that B&D had the ability to operate in a non-negligent manner but had failed to do so. The trial court properly exercised its discretion in ordering B&D to employ an engineer to design and implement necessary changes to address the drainage and sediment issues. This relief is consistent with the classification of the nuisance as temporary.

We next address the portion of the trial court's order which requires B&D to remove the sediment "at the points nearest the point of discharge where the waters run into the plaintiffs' pond . . . at the cost and expense of the defendant."

We have struggled to fully apprehend B&D's argument in opposition to this portion of the trial court's order. B&D sets forth the issue that it is raising on appeal with regard to this matter as follows: "Assuming the Plaintiffs could prove that the Defendant was the

proximate cause of the sediment, whether there was sufficient proof to support the damages (i.e. to clean the Pond) awarded to the Plaintiffs by the trial court for a temporary nuisance." In addressing this issue, B&D distinguishes between legal relief in the form of damages that can be awarded in temporary versus permanent injunction cases. B&D asserts that "[t]emporary nuisance only permits recovery for loss of enjoyment" and that it is measured by diminution in rental value during the time of the nuisance. As for permanent nuisances, B&D asserts that damages are measured through diminution in value and that plaintiffs must prove the amount of damages with a reasonable degree of certainty in order to recover. As to both points, B&D cites case law related to conventional monetary damages. B&D then transitions, with no authority or explanation offered, into addressing the injunction issued by the trial court regarding cleaning the pond. B&D's ultimate argument is that "[t]he preponderance of the evidence in this case does not support the trial court's order directing the Plaintiff is entitled to recover the cost to remove sediment from the northernmost end of the Plaintiffs' Pond."

To the extent that B&D argues that restoration of a property is not a remedy available in connection with a nuisance claim, that contention is plainly incorrect under Tennessee law. *See*, *e.g.*, *Windrow v. Middle Tennessee Elec. Membership Corp.*, 376 S.W.3d 733, 738 (Tenn. Ct. App. 2012) (noting that "[a] party asserting a claim of private nuisance may be entitled to several types of remedies, including injunctive relief, the cost of restoring property to its pre-nuisance condition, or damages for inconvenience, emotional distress, or injury to the use and enjoyment of the owner's property"). Addressing remedies as to private nuisance claims, the Tennessee Supreme Court has made it clear that "courts provide an appropriate remedy in the form of either damages or injunctive relief or both." *Lane v. W.J. Curry & Sons*, 92 S.W.3d 355, 365 (Tenn. 2002). Accordingly, insofar as B&D suggests that restoration is unavailable as a remedial measure in connection with a nuisance claim, its contention is unavailing.

Furthermore, the trial court's ultimate order addressing restoration of the pond is better understood as a grant of equitable injunctive relief rather than a conventional monetary damage award. In accordance with the trial court's ultimate ruling, B&D is required to clean the pond, paying to do so, not to pay monetary damages to the Lipperts for their loss of use and enjoyment of the pond. In the wake of B&D's motion to alter and amend, the trial court expressly eliminated its prior monetary damage award in connection with diminution in value resulting from the damages to the pond. Instead, the trial court noted that "the appropriate remedy" is its "ordering the sediment to be removed by the defendant." As to what sediment the trial court was referring to, the trial court had in a prior order specified "the sediment at the northernmost end of the pond, as shown on [Mr. Lippert's] trial exhibit #25." Addressing this, the trial court explained

> While the court understands that this pond is more than 30 years old, and
> therefore would have, under normal conditions, had some sediment settling
> in the pond prior to the defendant's actions. However, at the points nearest

the point of discharge where the waters run into the plaintiffs' pond, the Court finds that this sediment should be removed at the cost and expense of the defendant.

The trial court indicated that its ruling was one "requiring the Defendant to clean up the Plaintiffs' pond" as described above. This is something recognized by B&D in its statement of the issue, noting it has been required "to clean the Pond." B&D, however, develops no argument in support of its contention that a party must prove the cost of equitable relief stemming from remediating a defendant's negligent nuisance conduct. Nor does B&D provide any authority addressing where the burden of proof may fall in seeking to resist imposition of such an injunctive remedy based upon potentially excessive costs. B&D's argument and the authority that it provides only address conventional monetary damage awards and what must be shown in support thereof. Simply stated, regarding the actual remedy issued, the argumentation as developed by B&D is simply not fully attuned to the nature of the actual remedy granted by the trial court. It is not the role of this court to develop such an argument for the party. *See Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010).

Additionally, the trial court expressly determined that "this remedy can be achieved by the reasonable expenditure of money by the defendant." B&D insists that the record contains no evidence to support this conclusion. The record, however, does contain evidence addressing costs of remediation of the pond. Mr. Brown testified as to the costs. No contemporaneous objection was raised to this testimony. While B&D does not believe this evidence should be considered because Mr. Brown was not qualified as an expert witness, there is no ruling from the trial court that excludes this evidence nor is there a fully developed and supported argument on appeal addressing why this evidence cannot be considered. Furthermore, the Lipperts submitted to the trial court a statement of damages that included detailed estimates from service providers as to remediation costs for the pond. B&D moved to strike the separate submissions from the plaintiffs of appraisals in connection with establishing diminution of property values, but the record does not contain a comparable motion to strike as to these filings related to the costs of remediation of the pond. The trial court ultimately concluded that awarding monetary damages for diminution in value of the property that had not been proven during the trial was improper and amended its original order insofar as it allowed for appraisals to show the diminution in value and also struck the appraisals. The record, however, contains no comparable ruling from the trial court striking the Plaintiff's statement of costs and the accompanying estimates from service providers in connection with remediation of the pond. Nor has B&D fully developed and supported on appeal an argument that these could not be considered. It is not the role of this court to develop such an argument for the party. *See Sneed*, 301 S.W.3d at 615. From our review of the record considered in light of the arguments presented by B&D, we cannot conclude that the trial court erred in ordering B&D to remove the accumulated sediment from the northernmost end of the pond.

## B. Award for "Emotional Distress"

B&D also challenges the trial court's award of $20,000 for emotional distress caused by B&D's nuisance activities. At its foundation, B&D's challenge is predicated upon the Lipperts' complaint having failed to provide adequate notice that emotional distress damages were sought in this action. Building upon this foundation, B&D contends that, in the context of a nuisance claim, damages for emotional distress are special damages under Tennessee Rule of Civil Procedure 9.07. Rule 9.07 provides that "[w]hen items of special damage are claimed, they shall be specifically stated." "The fundamental purpose of the pleading requirement in Tenn. R. Civ. P. 9.07 is notice." *Hardcastle v. Harris*, 170 S.W.3d 67, 90 (Tenn. Ct. App. 2004).

The Lipperts respond that emotional distress damages are available as a remedy in a nuisance action under Tennessee law. The Lipperts, however, in their briefing on appeal, fail to address B&D's contention that, in the context of a nuisance action, emotional distress damages are special damages. Regarding the even more foundational concern about lack of notice, the Lipperts note that their complaint contained the following remedial request: "Plaintiffs further request such other and further relief to which they may be entitled upon a hearing in this matter." In considering the parties' contentions, "[t]he interpretation of the Tennessee Rules of Civil Procedure is a question of law which we review de novo." *PHI Air Med., LLC v. Corizon, Inc.*, 628 S.W.3d 460, 474-75 (Tenn. App. 2021) (citing *Lacy v. Cox*, 152 S.W.3d 480, 483 (Tenn. 2004)).

There are some subtle variances in how various state courts understand the difference between general and special damages. Tennessee's formulation of the line of demarcation between general and special damages has deep historical roots in state law reaching well into the 1800s and enduring into the present. In 1873, the Tennessee Supreme Court, addressing the distinction, stated the following: "Damages must result from the injuries complained of. These which necessarily result are termed general damages. Special damages must be averred before they can be proven. They are such as are the natural consequences of the act complained of, though not the necessary results." *Burson v. Cox*, 65 Tenn. 360, 362 (1873). In delineating the two categories, the Tennessee Supreme Court drew upon Professor Simon Greenleaf's *A Treatise on the Law of Evidence*:[1]

> Those which *necessarily* result are termed *general damages*, being shown under the *ad damnum,* or general allegation of damages, at the end of the declaration; for the defendant must be presumed to be aware of the necessary consequences of his conduct, and therefore cannot be taken by surprise in the proof of them. . . . But where the damages, though the *natural* consequences of the act complained of, are *not* the *necessary* result of it, they are termed

---

[1] *Burson*, 65 Tenn. at 362.

*special damages*; which the law does not imply; and, therefore, in order to prevent a surprise upon the defendant, they must be particularly specified in the declaration, or the plaintiff will not be permitted to give evidence of them at the trial.

2 Simon Greenleaf, *A Treatise on the Law of Evidence* § 254 (10th ed. 1868).

Addressing Tennessee law on this matter approximately a century later, *Caruthers' History of Lawsuit* set forth the same understanding:

General damages are such as *naturally* and *necessarily* result from the wrong or injury complained of, while special damages are such as naturally *but not necessarily* result from the wrong or injury complained of. . . .   [Special] damages should be alleged in the pleadings.  . . . The rule requiring special damages to be pleaded . . . is for the benefit of the defendant, so that he may prepare his evidence to meet the allegations . . . .

*Caruthers' History of a Lawsuit: A Treatise on Procedure in the Courts of Tennessee with Forms and Rules of Practice* §155 (8th ed. 1963).

For more than 150 years, Tennessee courts have maintained this understanding of the difference between general and special damages, which traces at least as far back as the aforementioned 1873 *Burson* decision. *See*, *e.g.*, *Mitchell v. Mitchell*, 876 S.W.2d 830, 831 (Tenn. 1994) (quoting *Lance Prod. v. Commerce Union Bank*, 764 S.W.2d 207, 213 (Tenn. Ct. App. 1988)) ("Where damages, though the natural results of the act complained of, are not the necessary result of it, they are termed 'special damages' which the law does not imply and which must be alleged in order that evidence on the subject may be admissible."); *Lasater Lumber Co. v. Harding*, 189 S.W.2d 583, 591 (1944) ("Where damages, though the natural consequences of the act complained of, are not the necessary results of it, they are termed special damages which the law does not imply; and therefore, in order to prevent a surprise upon the defendant, they must be particularly specified in the declaration, or the plaintiff will not be permitted to give evidence of them on the trial; but where the special damages are natural consequences of the wrongful act, the jury may infer it from the wrongful act."); *Louisville & N. R. Co. v. Ray*, 46 S.W. 554, 555 (1898) ("Special damages are the natural, but not necessary, result of the injury complained of; and hence they must be specially alleged in order that the defendant may have notice thereof, and be prepared to meet the same upon the trial."); *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 383 (Tenn. Ct. App. 2006) ("General damages are those 'which are the natural and necessary result of the wrong complained of.'  Special damages are 'those damages which are the natural but not necessary result of the wrong.'" (citation omitted)).

The Lipperts are correct that damages for emotional distress are potentially available to plaintiffs in nuisance actions.  *See*, *e.g,*, *Lane*, 92 S.W.3d at 365; *Pryor v. Willoughby*,

36 S.W.3d 829, 831 (Tenn. Ct. App. 2000). B&D, however, is correct that in this context, while emotional distress is available as a remedy in a nuisance action, it is a special, not general, damage. Considered in light of the Tennessee standard addressed above, while emotional distress may naturally result from nuisance, it does not necessarily do so. The comments to Restatement (Second) of Torts in addressing the tort of private nuisance help to make this point clear. In explaining what is and what is not inherently within the domain of the harms caused by nuisance, the Restatement expressly excludes emotional distress: "This interest in freedom from annoyance and discomfort in the use of land is to be distinguished from the interest in freedom from emotional distress." Restatement (Second) of Torts § 821D cmt. b (1979);[2] *see also*, *e.g.*, *Blackard v. Hercules*, Inc., 17 F. Supp. 3d 576, 580-82 (S.D. Miss. 2014) (engaging in an in-depth analysis of whether emotional distress constitutes a general or special damage and ultimately concluding that for nuisance actions emotional distress is a special damage).

The Lipperts do not suggest, and their complaint does not reflect, that they specifically pled emotional distress damages in accordance with Tennessee Rule of Civil Procedure 9.07. We cannot conclude that the complaint provided adequate notice that the Lipperts were seeking damages for emotional distress so as to allow B&D to defend against such an award. Accordingly, we reverse the trial court's award of $20,000 in damages for emotional distress.

VI.

---

[2] The Restatement (Second) of Torts explains "interest in the use and enjoyment of land" and the distinction between that concept and "emotional distress" as follows:

> The phrase "interest in the use and enjoyment of land" is used in this Restatement in a broad sense. It comprehends not only the interests that a person may have in the actual present use of land for residential, agricultural, commercial, industrial and other purposes, but also his interests in having the present use value of the land unimpaired by changes in its physical condition. Thus the destruction of trees on vacant land is as much an invasion of the owner's interest in its use and enjoyment as is the destruction of crops or flowers that he is growing on the land for his present use. "Interest in use and enjoyment" also comprehends the pleasure, comfort and enjoyment that a person normally derives from the occupancy of land. Freedom from discomfort and annoyance while using land is often as important to a person as freedom from physical interruption with his use or freedom from detrimental change in the physical condition of the land itself. This interest in freedom from annoyance and discomfort in the use of land is to be distinguished from the interest in freedom from emotional distress. The latter is purely an interest of personality and receives limited legal protection, whereas the former is essentially an interest in the usability of land and, although it involves an element of personal tastes and sensibilities, it receives much greater legal protection.

Restatement (Second) of Torts § 821D cmt. b (1979). This understanding is in accord with viewing emotional distress as a natural, but not a necessary, consequences of nuisance.

For the aforementioned reasons, we affirm in part and reverse in part the judgment of the Circuit Court for Bradley County. We affirm the trial court's finding of liability for temporary nuisance, and the injunction requiring abatement of ongoing runoff and removal of the sediment attributable to the nuisance. However, we reverse the award of $20,000 for emotional distress. Costs of this appeal are taxed equally to the Appellant, B&D Real Estate Properties, LLC, and the Appellees, Leighton H. Lippert and Richard D. Lippert, for which execution may issue if necessary.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE